**LANCASTER et al. v. MEBANE.**    (No. 2855.)\*

(Court of Civil Appeals of Texas. Texarkana. March 7, 1924. Rehearing Denied March 20, 1924.)

1. **Limitation of actions** ⊝‒127(4)—Amendment of petition held not to materially change cause of action so as to affect running of statute.

An amended petition, in an action for damages for delay and deviation in route in the transportation of a corpse, filed after expiration of the period of limitation, *held* not to materially change the cause of action as stated in the original petition filed within the time for bringing suit under the statute.

2. **Evidence** ⊝‒20(2)—Court may take judicial notice of train route.

The court may take judicial notice of the fact that a particular train runs through the city where the court is in session.

3. **Carriers** ⊝‒134—Evidence held to establish plaintiff party to contract for transportation of corpse.

In an action, by a relative of deceased, for damages for delay and deviation in the route of transportation of a corpse, evidence *held* to establish a contract between defendant and plaintiff, though the ticket purchased for plaintiff, who was to accompany the corpse, was purchased by her brother, and to establish that such brother was acting in her behalf.

4. **Receivers** ⊝‒183 — Proof that defendants sued as receivers were in fact such held sufficient in absence of denial.

In an action against the receivers of a railroad company for delay and deviation in the route of transportation of a corpse, where the ticket issued to plaintiff appeared to have been issued by defendants as receivers, and where there was no pleading specifically denying the capacity in which they were sued, *held*, that further proof of their capacity as receivers was unnecessary.

5. **Appeal and error** ⊝‒1040(16)—That part of petition, testimony to support which not offered, subject to special exception, held not to present error.

The fact that certain paragraphs of a petition were subject to special exception *held* not to present error, where no testimony was offered in support of such pleadings.

Appeal from District Court, Bowie County; Hugh Carney, Judge.

Action by Florence Mebane against J. L. Lancaster and others, Receivers of the Texas & Pacific Railway. Judgment for plaintiff, and defendants appeal. Affirmed.

See, also, 247 S. W. 926; 260 S. W. 252; 260 S. W. 259.

Besides a demurrer and special exceptions to the petition, the appellants pleaded a general denial and the statute of two years' limitation in bar of recovery.

The jury returned a verdict in favor of the appellee for damages in the sum of $1,-250.

The evidence shows that the mother of the appellee had gone to El Paso for the benefit of her health, and later died there on April 25, 1921. Her home was in De Kalb, Tex., where she and her family had lived for a number of years. At the time of her death, which was not unexpected, there were present her husband, son, and three daughters, the appellee being one of the daughters. The appellee at the time was unmarried and lived with her father and mother. The family present all decided and agreed to bury the deceased at De Kalb, Tex., on April 27, 1921, at 10 o'clock a. m., and to have the funeral arrangements made accordingly. They agreed among themselves to transport the corpse direct to De Kalb, and for each one of them to go with it, over the Texas & Pacific Railway in continuous passage, by way of Texarkana, on the Sunshine Special train. The line of the Texas & Pacific Railway runs from El Paso to Texarkana, with a branch line from Fort Worth via Whitesboro and De Kalb to Texarkana. At the time in question there was operated over the Texas & Pacific Railway from El Paso to Texarkana a fast through passenger train, known as the Sunshine Special, leaving El Paso at 4:15 o'clock p. m. and arriving at Texarkana the next day at 10:45 p. m. A passenger train also regularly left Texarkana for Fort Worth over the branch line daily at 8 o'clock a. m., arriving at De Kalb, 34 miles distant, at 9:45 a. m. A passenger train also regularly left Fort Worth for Texarkana over the branch line daily at 7:25 a. m., arriving at De Kalb at 4:50 p. m. The schedule time from El Paso to De Kalb via Texarkana, on the Sunshine Special out of El Paso, is seven hours earlier than the schedule time of the passenger train via Fort Worth and Whitesboro. The schedule time of the trains were known to the family of the deceased at the time they agreed upon the time of the

burial and upon the route of travel to De Kalb. The brother of appellee testified:

"At the time of my mother's death my father, three sisters, and myself were present. In making ararngements for the burial of my mother we just talked it over and decided for me to go down and get the tickets after we had definitely decided where we would bury her and at what time. We decided to bury her at home on April 27 at 10 o'clock. I was to go buy the tickets, also see an undertaker, and do the wiring. I wired Mrs. Crew at De Kalb from El Paso to make the arrangements at that end of the line. I told her we would be in Texarkana on the Sunshine Special, and I think I said 'to-morrow night.' That was April 25. I think I said we would be in Texarkana to-morrow night at 11 o'clock. I bought a ticket for my father, one for the corpse, and one for each of my sisters. The following receipt was given by the railway ticket agent:

"'El Paso, Texas, April 25, 1921.

"'Texas & Pacific Railway Co.

"'Received amounts as stated El Paso, Texas, to De Kalb, Texas, via Texarkana.

| No. Tickets. | Amount Received. |
|---|---|
| No. 15584 | $34 88 |
| No. 15585 | 34 88 |
| No. 15586 | 34 88 |
| No. 15587 | 34 88 |
| No. 15589 | 34 88 |

"'[Signed] R. F. Blackburn,
"'Agent T. & P. Ry. Co.'

"Among those five tickets was the corpse ticket for the passage of my deceased mother from El Paso to De Kalb. The corpse ticket reads [reading from it]:

"'The Texas & Pacific Ry., J. L. Lancaster and Charles L. Wallace, Receivers. El Paso [City] Texas, to De Kalb, Texas, via Texarkana. Good for one continuous passage commencing not later than one day after date of sale. Subject to tariff regulations.

Form
"'15584 Local 1
861

"'Geo. D. Hunter, General Passenger Agent.

"'Check to be taken up by first conductor.

"'El Paso [City] Tex., to De Kalb, Texas. 15584. Not good for passage. Form Local 1. Texas and Pacific Railway.'

"It is indorsed 'corpse ticket' across the front and on the back, and on the back is dated 'April 25, 1921.'

"Before purchasing these tickets I discussed with the agent as to what train we wanted to go on, and gave him the reasons why. The Sunshine Special route was selected on account of its getting in nearly a day earlier. The agent routed me that way. * * * I purchased the tickets at the city ticket office, the uptown office, in El Paso. I did not know the agent, and I don't think he knew me. I can't remember the exact language used by him and myself. I told him my mother was dead and that I wanted a corpse ticket and four other tickets, for my father, sisters and myself, and that I wanted to go by way of Texarkana as it would put me at home earlier than the other way. I explained why I wanted to go that way. I do not remember telling him what hour the funeral was set for, and I don't remember telling him what day we expected to bury my mother. I used

260 S.W.—17

some of my own money and some of my father's money, and my sister drew some and gave me the money to buy the tickets. * * * My father did not go with me to the ticket office, and neither did any of my sisters. * * * At the time I purchased the tickets I told the agent why I wanted to be directed by Texarkana. He suggested another route via Fort Worth, and I told him why I wanted to go by way of Texarkana. I told him we wanted to go by Texarkana because it would put us in home nearly a day earlier. He routed us via Texarkana. * * * After obtaining the tickets my sisters, my father, and myself boarded the Sunshine Special at 4:15 p. m., April 25, and there was placed aboard that same train the corpse of my mother. I saw the corpse at the station and know it to be a fact that it was placed aboard that same train."

The appellee testified:

"I was present in El Paso at the death of my mother, and I, together with the family, made arrangements for the funeral. We planned it all together. We made arrangements with my brother, Jamie Mebane, to purchase the tickets from El Paso to De Kalb. We left El Paso on the Sunshine Special at 4:15 p. m. on April 25, 1921, and my mother's remains were placed aboard that train. I used one of the tickets that my brother purchased for this trip. We made arrangements for the burial to take place at our home at De Kalb at 10 a. m. on April 27. We had planned to get there at about 9 a. m., and we knew we would arrive in Texarkana in time to take the 8 o'clock train out of there, getting us in De Kalb at 9 o'clock. I did not go to the ticket office to purchase the tickets. I left that matter up to my father and brother, but we planned and sent my brother to the ticket office for the entire family, and he got a ticket for all of us. My father advanced the money. We were all of one family, and we had worked for a part of it. Part of it was my money. Our home was sold and the money was in the bank and it belonged to the family. I signed a check for some of the money. The money was in my father's name; it had been placed there before my mother's death. * * * Before we arrived in Texarkana I learned that my mother's remains were not on that train. My brother told me at Mt. Pleasant. It was after 1 o'clock in the morning that we got into Texarkana. Shortly after 1 o'clock my brother made every effort to locate my mother's remains, and it was shortly after 4 o'clock in the morning of the 27th when he finally located the corpse at Fort Worth. It was between 2 and 3 o'clock p. m. of the 27th when we learned that mother's remains were on a train headed for De Kalb. The body arrived in De Kalb about 5 p. m. on the east-bound train. It was just dark when the services were ended. After we learned that mother's remains were not on the train, we were naturally horrified to know that we had lost the body, or that it was misplaced."

It was shown that the corpse reached De Kalb at 5 p. m., April 27, coming over the branch line from Fort Worth via Whitesboro. As a consequence the funeral did not occur until about 5:50 p. m. of April 27. It appears that the dead body was taken from the Sunshine Special train at Fort Worth. The

following explanations appear: The station master at Fort Worth testified:

"I remember about the corpse of Mrs. Mebane being taken off of the train at Fort Worth in April, 1921, off of the Sunshine Special. I personally supervised the taking of this corpse from the train at Fort Worth. Under the method of doing business, when I found baggage or a corpse shipped from El Paso, say to De Kalb, and there was nothing on the check to show that it was to go by Texarkana, the usual route for it to be carried would be over the transcontinental division. I think it is from three to five miles shorter route via the transcontinental division to De Kalb than it is over the main line. It was the custom of the Texas & Pacific to transfer baggage that came in from El Paso to the transcontinental division to carry it by Whitesboro and on. That is why I took this corpse off at Fort Worth. I tried to find an attendant with the corpse at Fort Worth. I had the gateman to watch out, and I made inquiry of one or two passengers. I did not find or see any attendant. I then placed the corpse in the baggage room and kept it there until it went out at 7:25 a. m. the next day on the transcontinental division. I first discovered that this corpse should have gone via Texarkana the next morning at the time we got it out on No. 32 at 7:25 a. m. There is supposed to be an escort with every corpse; that is a rule and regulation."

The general baggage agent testified:

"The checking of baggage in El Paso is done by a terminal company, which is separate from the T. & P. The proper route for baggage, where there is no special direction, from El Paso to De Kalb, would be via Fort Worth. If it is checked via Texarkana it would go by there, but if not so specially routed it would be taken off at Fort Worth and sent on transcontinental division, which is a nearer route. * * * Before issuing a baggage check there must be a ticket presented, and the baggage is checked by the route on the ticket. From the ticket is made out the baggage check. Whoever makes it out should make it as called for in the ticket."

It was proven that appellee's brother, after he purchased the tickets, handed the "corpse ticket" to the undertaker at El Paso for him to "check" the corpse according to the railway regulations, and there was issued and delivered to the undertaker a "check," which he delivered to the brother of the appellee together with the "corpse ticket." The appellants' evidence shows that the "check," which was on the casket, recites, "From El Paso U. D. via T. & P. R. R. to De Kalb." The appellee testifies that the check issued and delivered recites, "El Paso to De Kalb via Texarkana."

King, Mahaffey & Wheeler, of Texarkana, for appellants.

Sid Crumpton, of Texarkana, and O. B. Pirkey, of New Boston, for appellee.

LEVY, J. (after stating the facts as above). The appellants predicate error in refusing

to give a requested peremptory instruction to the jury, upon the grounds, viz.: (1) That appellee's cause of action was barred by limitation because more than two years had elapsed from the accrual of the cause of action to the filing of the amended petition; (2) because the evidence failed to show that appellee was a party to the contract for transportation of her mother's corpse; (3) because the evidence fails to show that Jamie Mebane, in purchasing the corpse ticket, gave notice to appellants' agent that he was acting for appellee; (4) because no evidence was introduced at the trial showing that appellants were receivers of the Texas & Pacific Railway.

[1] The cause of action alleged in the amended petition is not, we think, essentially legally different from the cause of action alleged in the original petition, filed more than two years before the amended petition. Both petitions predicate the right of appellee to recover damages for mental anguish, suffered through an alleged wrongful act, upon the violation by appellants of the terms of an express agreement, evidenced by the ticket, by which the appellee was to travel in continuous passage on the same train on which the corpse of her mother was to be forwarded for burial from El Paso to De Kalb. The alleged wrong consisted of the act of separating her from the right to accompany the corpse on the same journey in continuous passage from El Paso to De Kalb, by removing the corpse from the train at Fort Worth. The original petition alleged that "at the same time" the "corpse ticket" was purchased the appellants' agent sold and the appellee purchased a ticket "over the same line to De Kalb, Texas," as the "corpse ticket" called for, and that "the corpse of the mother of this plaintiff was placed aboard a train of the defendant company known as the Sunshine Special train, to be shipped to De Kalb, Tex., and this plaintiff also boarded said train for passage to De Kalb." The reasonable implication from the facts alleged is that the appellants agreed and actually undertook to transport the appellee in continuous passage with the corpse, over the same route, on the Sunshine Special train via Texarkana "to De Kalb, Texas." The allegations that "the corpse was placed aboard the Sunshine Special train to be shipped to De Kalb, Texas," and that "this plaintiff also boarded said train for passage to De Kalb," imply a continuous travel to De Kalb by way of that train.

[2] And the court can take judicial knowledge of the fact that the Sunshine Special train runs via Texarkana. The amended petition only makes more definite the routing, by affirmatively stating that the transportation was to be from "El Paso to De Kalb via Texarkana," and does not enlarge or essentially change the cause of action as originally pleaded.

[3] Respecting the second and third grounds stated, above, it appears sufficiently, we think, from the evidence of Jamie Mebane, that the ticket agent at El Paso had actual notice that the transportation tickets were for the father, the son and each daughter. The transportation tickets were to be routed, as the agent was informed and knew, by the same special route by which the corpse was to be forwarded, in order for the appellee and the other members of the family to accompany the corpse through to destination at De Kalb. Jamie Mebane testified:

"I bought a ticket for my father, one for the corpse, and one each for each of my sisters, and I got a receipt for those tickets. Each ticket cost me $34.88, including the corpse ticket. Before purchasing these tickets I discussed with the agent as to what train we wanted to go on, and gave him the reasons why, and the Sunshine Special was selected on account of its getting in nearly a day earlier, and I wanted to get there at 9:45, I believe, and because the Sunshine Special runs direct from El Paso to Texarkana. * * * The agent routed me that way. * * * I did not know the agent, and I don't suppose that he knew me. I can't remember the exact language that was used by him and myself when I went there to get the tickets, except that I told him my mother was dead and that I wanted one corpse ticket and four other tickets for my father, and sisters and myself, and that I wanted it to go by way of Texarkana so that it would put me at home earlier than the other way. I explained why I wanted to go that way. * * * My father did not go with me to the ticket office, and neither did my sisters go. * * * At the time I purchased these tickets I told the agent at El Paso why I wanted to be directed by Texarkana. He suggested another route. He suggested Fort Worth, and I told him we wanted to go by Texarkana as it would put me at home nearly a day earlier. He routed us via Texarkana."

The appellee testified:

"We made arrangements with our brother Jamie to purchase the tickets from El Paso to De Kalb. We left El Paso on the Sunshine Special train, and my mother's remains were placed aboard that same train. I used one of the tickets that my brother purchased for this trip. * * * I did not go to the ticket office to purchase the ticket. I left that matter up to my brother and father, but we planned and arranged it ourselves, and then sent my brother to the ticket office for the entire family, and he got a ticket for all of us. My father advanced the money, and we were all one family. We had worked for part of it, and part of it was my money. Our home had been sold and the money was in the bank in my father's name, and it belonged to the family. I signed a check for some of that money."

[4] In respect to the last point stated above, it appears from the ticket in evidence that it was issued by "the Texas & Pacific Railway, J. L. Lancaster and Charles L. Wallace, Re-

ceivers." And it further appears that appellants were sued as "coreceivers of the Texas and Pacific Railway." There was no pleading specially denying the capacity in which appellants were sued, nor is the fact of receivership specially denied. In the absence of a special plea denying appellants' capacity as receivers, further proof than above stated to sustain the allegations as to "appointment" was not required as essential to a judgment. Schaff v. Nash (Tex. Civ. App.) 193 S. W. 469.

The appellants predicate error upon submitting to the jury the question of damages only. It is concluded that the evidence presented the issue of fact only, as to damages, for the reasons stated in the companion case of Lancaster et al., Receivers, v. Jamie Mebane (Tex. Civ. App.) 260 S. W. 252, this day decided.

We have considered the other assignments of error, and conclude that they should be overruled.

[5] The petition, reasonably construed, sues the appellants as receivers, and not the railway company, as such. And if a special exception lies as urged, to certain paragraphs of the petition it appears from the record that testimony was not offered in support of such pleadings, and therefore material injury does not appear in the ruling of the court.

The judgment is affirmed