### 600 CALIFORNIA CORPORATION
v.
### HARJEAN CO.
Civ. A. No. 4-902.

United States District Court
N. D. Texas,
Fort Worth Division.
April 3, 1968.

Cantey, Hanger, Gooch, Cravens & Scarborough, Fort Worth, Tex., for plaintiff.

Crenshaw, Dupree & Milam, Lubbock, Tex., and Hardeman, Smith & Kever, San Angelo, Tex., for defendant.

## OPINION

BREWSTER, District Judge.

600 California Corporation is in the final stages of a corporate combination with a subsidiary of Tenneco, Inc., with the requisite approval of its board of directors, the overwhelming majority of its stockholders and the appropriate state and governmental authorities. As might be expected in the case of a corporation with about 4,323,000 outstanding shares of common stock distributed among more than 17,000 different owners, there are a few disgruntled shareholders. A small group of them who own a combined total of a *small fraction* of one per cent of all the stock have been trying to delay or block the consummation of the corporate reorganization plan by multi-forum, repetitious injunction suits, while the remaining owners of more than ninety-nine per cent of the stock are waiting helplessly for their stock to be exchanged in accordance with the terms of the plan. Such actions have been dismissed or have become dormant as the preliminary hearings held therein disclosed that the complaining stockholders had little or no chance of success. Decisions adverse to the complainants in those preliminary hearings have accomplished little, however; for activity in other similar cases already pending or filed shortly thereafter in courts from Nebraska to Texas to California have had the attorneys, officers and witnesses of 600 California Corporation spending most of their time going from one preliminary hearing to another fighting delay actions. On one occasion, a state court in Midland, Texas, had to grant a recess of several days in a preliminary hearing then being held in one of the actions to allow the attorneys to attend a preliminary hearing in another of such cases in a federal court in Lincoln, Nebraska. Sometimes, the named plaintiffs have been the same in different suits a thousand miles apart, and sometimes they have been the actual parties in only one case. The attorney most active for the plaintiff in each of the cases, however, has been the same person, flying from the scene of one lawsuit to that of another, sometimes in a chartered jet, claiming that previous adverse judgments were no obstacle because they were not final. It is apparent that the obvious expenses of the litigation in some instances will exceed the entire value of the plaintiff shareholder's stock, and in all instances will be more than the difference between the claimed value and the figure he is getting under the reorganization plan. The plaintiffs in those cases have insisted that they did not expect to be held responsible for the expenses, and have

claimed that they did not know who was putting up the money for such expenses. Some of those suits were still pending at the time of the hearing in this case, and the plaintiff here alleges that others will in reasonable probability follow, all to its irreparable injury.

The plaintiff here alleges that such type of litigation, with no hope of success from either a practical or a legal standpoint, is maintained only for the purpose of delaying the consummation of the plan for reorganization and is therefore for vexation and harassment. It has brought this class action against Harjean Co., individually and as a representative of the shareholders of 600 California Corporation, seeking to enjoin the further prosecution of suits now pending and the filing of any further actions asking that the closing of the plan be restrained or rescinded.

The defendant denies that the litigation in question has been or is being prosecuted for the purpose of vexation and harassment, and says that, in any event, 28 U.S.C.A. § 2283 deprives a federal court of the authority to enjoin the character of state court proceedings here involved.

This Court granted a temporary restraining order that maintained the *status quo* until the hearing could be had on the application for temporary injunction. A full evidentiary hearing has been held, and the Court has the benefit of a detailed background of this controversy through affidavits, oral testimony and documentary evidence received in such hearing. The facts and inferences in this opinion are sifted from that mass of evidence, which includes, among other things, the pleadings and the transcripts of the proceedings in the pertinent litigation hereinafter described. Considerable time and effort have been spent assembling and organizing these matters, and the Court has had to make a choice between a short opinion dealing with them summarily or one setting them out in some detail. In view of the importance of the case, the Court has chosen the latter course, even

at the expense of a lengthy opinion, believing that in the long run it will be more convenient for a court having occasion to review this case to have the complete story in one instrument.

The Court is of the opinion that the application for temporary injunction should be granted with the limitations and to the extent hereinafter indicated.

600 California Corporation was formerly Kern County Land Company, a nationally known and publicly held corporation chartered by the State of California in 1890. Kern's stock was listed on both the New York and the Pacific Coast stock exchanges. Its main office and its books and records have been in San Francisco at all times. It operated highly successful, diversified businesses in the oil, agricultural, cattle, manufacturing, and land ownership and development fields. Some idea of the value and extent of its properties and business operations can be gained from the public tender offer of Occidental Petroleum Corporation hereinafter discussed, whereby Occidental obligated itself to pay around $83,500,000.00 for a little more than one-fifth of the issued and outstanding shares in Kern.

Kern's stockholders, directors and officers were apparently satisfied with the Kern corporate structure for operating its business until they realized in the spring of 1967 that radical action was necessary to keep from being taken over by Occidental on Occidental's own terms. Occidental was at that time apparently engaged in a very aggressive expansion program embracing, in part, the acquisition of other successful corporations. Around the middle of April, 1967, a relatively short time after Occidental had taken over the Permian Corporation, a sizeable oil company in Texas, Occidental's President and its Executive Vice President went to the office of the President of Kern in San Francisco and told him they were there to talk terms on which Kern would be merged with Occidental. Mr. Davis, the Executive Vice President referred to, had been President of Permian at the time of its take over,

and was apparently present to give testimony as to how painless the process was. The President of Kern was indignant about the efforts of Occidental to "raid" his company, and refused to discuss the matter. About three weeks later, on May 8th, Occidental made a public cash tender offer to buy Kern stock at $20.00 per share in excess of the price at which it was then listed on the New York Stock Exchange on a first come, first served basis, until it acquired 500,000 shares. On the last trading day prior to that time, Kern stock was listed on the Exchange at approximately $63.50. Occidental offered brokers $1.50 per share for all Kern stock secured for it by them, making each share so bought cost $85.00. The tender came without warning and as a complete surprise to Kern. Its officers then realized that Occidental was out to take over Kern. They sent out a letter to the shareholders in Kern advising that they believed a much better offer could be obtained, and suggested that the owners not be stampeded into selling their stock to Occidental. The first tender was filled within only a day or so, and Occidental immediately made a second tender to buy up to 500,000 additional shares at the same price it had paid under the first offer. By the middle of May, Occidental had become the owner of 886,623 shares, or over 20% of the corporate stock in Kern then issued and outstanding. Mr. Davis testified in one of the Midland cases that those tenders came about as a result of the refusal of the officers of Kern "to talk with us about any merger" and that "We felt like if we owned some stock, we might get their attention." Occidental's spending of more than $70,000,000.00 for the purchase of Kern stock did get the attention of Kern's officers, and further conferences were held. The minutes of the meeting of the Kern directors on May 19th state that Occidental made an oral proposal to the President of Kern on May 17th of terms on which Occidental would take over Kern. It was a blitz type offer, with the limitation that it would expire at 5:00 P.M., Pacific Daylight Time, May 19th. Occidental's original offer would have resulted in realization of not more than around $83.50 cash per share by Kern stockholders, leaving them with income tax problems arising as a result of any cash profits.

Kern saw that it was facing a crisis of being taken over then or later, and that the only apparent solution was to attempt to get a better offer. Its first step was to retain Morgan Stanley & Co., a widely known and reputable New York investment banking, corporate appraisal and financing firm. Morgan Stanley & Co. was already familiar with Kern's last public financing. Information then assembled indicated that on May 19, 1967, Kern could possibly liquidate for $127.00 per share under the most ideal conditions. Costs of liquidation and taxes estimated at $34.00 per share would have meant a distribution of $93.00 per share to the stockholders, with liability for income tax on any gains realized by them over the original cost of the stock. It was estimated that about five years would be required for the orderly liquidation of Kern's widespread business interests and properties, and that there would be little likelihood of dividends during that time. The recommendation of Morgan Stanley & Co. was against liquidation, and the Kern directors decided to seek other offers on a combination with a large corporation.

Word about Occidental's interest in acquiring Kern had caused Tenneco, Inc., a Delaware corporation, to become interested. Tenneco secured a Negotiating Permit from the Division of Corporations of California and made a definite offer. Morgan Stanley & Co. recommended acceptance of Tenneco's offer, and Kern's board of directors unanimously adopted a resolution to do so if the necessary approvals were obtained. A formal written agreement embracing the plan for the proposed corporate reorganization and combination was signed as of June 1, 1967, by Kern, Tenneco, and KCL Corporation, a subsidiary of Tenneco, to become effective if and when the plan

should receive the requisite approval of state and governmental authorities and of Kern's stockholders.

On the day after the consummation of the written agreement between Kern, Tenneco and KCL, Occidental gave Tenneco an option to acquire its 886,623 shares of Kern stock on the basis provided for in the plan. However, Occidental got a cash payment of $10.00 per share, or a total of $8,866,230.00, for executing the option.

The plan outlined in the agreement of June 1, 1967, called for the transfer of all the assets of Kern to KCL, the assumption by KCL of Kern's liabilities, and the exchange of cumulative convertible preferred stock in Tenneco for the outstanding stock in Kern. Under the agreement, Kern was to change its name to 600 California Corporation, transfer all of its assets, property, business and good will to KCL, and then be dissolved under the laws of California and distribute the Tenneco stock to its shareholders *pro rata* in exchange for their stock in Kern. KCL was then to change its corporate name to, and thereafter operate as, Kern County Land Company.

The plan was approved by the stockholders of Tenneco at their meeting on July 11th.

On June 16, 1967, Kern sent a notice [1] to all of its shareholders informing them of the details of the proposed plan and advising them that a special stockholders' meeting would be held on July 17, 1967 for the purpose of approving or rejecting it. Two previous letters briefly describing the Tenneco proposal had been sent out in the latter part of May. The letter sent on June 16th also contained the respective balance sheets of Kern and Tenneco, pertinent financial data, geologists' opinions as to Kern's oil reserves, notice of the option agreement between Tenneco and Occidental, and other relevant information. The share-

holders were urged to participate in the meeting in person or by proxy, and the directors of Kern recommended that the plan be approved. The proposed proxy statement was submitted, as required by law, to the Securities and Exchange Commission at least ten days in advance of the proposed mailing of the statement to the shareholders. The Commission reviewed it and made suggestions for certain changes and additions; and it was mailed to the shareholders after being revised to meet such suggestions. A reminder of the coming meeting, sent out by Kern to all shareholders on June 29, 1967, again urged personal attendance or representation by proxies. The procedure for calling the meeting met all legal requirements.

The special stockholders' meeting on July 17, 1967 was held in San Francisco at the time and place designated in the notice, with an overflow crowd of shareholders present. 3,061,528 shares of Kern stock were represented by owners there in person or by proxy. That was more than 70% of the approximately 4,323,000 shares of the company then issued and outstanding. Under California law, a transfer of the entire assets of a corporation could be made only if at least a majority of all its outstanding stock was voted in favor of it. That meant the plan in this case required the support of approximately 2,160,000 shares for approval to be legally effective. After a lengthy discussion, pro and con, by the shareholders, a resolution was adopted approving the plan. The vote on the resolution was 3,039,190 shares "for" and 22,338 shares "against". The vote of approval represented approximately 70% of all outstanding shares and over 99% of those present at the meeting.

By its letter of July 21, 1967, Kern promptly advised its shareholders of the action taken at the July 17th meeting.

Occidental did not vote its shares at the July 17th meeting, but it did send its

---

1. This was actually a proxy statement, and all references in the opinion to the June 16th letter or June 16th notice are to

the proxy statement sent out on that date.

letter dated July 14th to the meeting to be read to the Kern shareholders present there. The letter said that while Occidental was disappointed that its plan for taking over Kern did not materialize, it did not care to offer "a more attractive proposal than that made by Tenneco." After stating that Occidental had decided not to vote its stock, the letter proceeded to say: "This does not mean that we view the transaction as unfair or inequitable to a KCL [Kern County Land Company] shareholder. Viewed solely in this light, we can say that if the whole of the transaction were one in which we had a right of appraisal we would not seek such right but would vote in favor of the sale of assets. * * *" The latter emphasized that Occidental had reached its decision not to oppose the plan before it entered into the option agreement with Tenneco.

Occidental's decision not to vote on the plan was also influenced by the problem it was facing under Sec. 16(b), the insiders' short swing profit provision, of the Securities Exchange Act of 1934. 15 U.S.C.A. § 78p(b).[2] This matter was noted in an Occidental prospectus which said: "Litigation to recover profit realized as a result of the foregoing transaction may be commenced under Section 16–B (sic) of the Securities Exchange Act of 1934. This Section provides that subject to certain exceptions the holder of more than ten per cent of a class of certain equity securities, including the Kern Stock, is accountable to the issuer for any profit realized by such holder, from any purchase and sale, sale and purchase of such security within a period of less than six months. In the event any such action is commenced Occidental intends to oppose such action and believes that it should prevail." Occidental had considered this problem from the early stages of the Kern-Tenneco negotiations, and had discussed the matter with its legal advisers. They had come to the conclusion that liability under Sec. 16(b) could be avoided on at least three grounds:[3] *First*, Occidental was an in-

2. 15 U.S.C.A. § 78p(a) defines a beneficial owner as one who is the owner, directly or indirectly, of more than 10% of any class of equity security which is negotiated on any national stock exchange. Sec. 78p(b) then provides: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized * * *."

3. The following is quoted from Mr. Nizer's statement during the course of the second injunction suit in Midland of Occidental's position in regard to the application of Sec. 16(b) to any profit realized by it under the option agreement with Tenneco:

"* * * We believe that 16–B (sic) has no application to this situation, your Honor, one doesn't have to be scholarly about it. 16–B (sic) is designed to forbid short swift transactions where an insider having inside knowledge sells or, that is, sells or buys within six months, he makes a profit, and he sells within six months to make that profit. Then he has to turn back the profits to the company. Mind, your Honor, it is not, there is not a statute, *it is no crime if you hold it six months and one day. The law permits that,* but within six months an insider can [not] travel that fast. Now here we have no 16–B problem of that character except that the issue was at least raised by enemies here with whom I am supposed to be allied. Now Occidental was no insider. Your Honor has seen the exhibits where

voluntary participant, rather than an insider, in the matter. *Second,* the transaction was an exchange instead of a sale. *Third,* the deal would probably not be completed until December; which would be more than six months after Occidental had acquired the Kern stock. Mr. Louis Nizer, counsel for Occidental in the second injunction suit in Midland, Texas, appeared before the S.E.C. during a recess in the hearing in that case in an attempt to secure an exemption for Occidental from Sec. 16(b). There is no claim that he got it.

The plan for reorganization provided that the closing date would be a time between September 30 and December 31, 1967, to be fixed by the corporate parties, or such other time as they might agree upon after receipt of an income tax ruling acceptable to the parties. However, progress made by the first part of August caused the parties to look forward to an earlier closing date than they had originally considered possible. The ruling from the Internal Revenue Service that there would be no income tax on the exchange of stock under the plan, if two conditions were met, came on August 4th. Arrangements were promptly made to meet those conditions; and the parties thereupon planned the closing in San Francisco for August 8th, if the State required permit for the issuance of the proposed Tenneco convertible preference shares could be obtained from the California Corporation Commission.[4] That appeared to be the

we tried to negotiate, and they wouldn't even permit us inside the doors. We had to sue, the evidence shows here we had to sue in San Francisco to examine their books after we were twenty per cent stockholders."

" * * * In this case an outsider, they call them an outsider in the exhibit, in that letter, that Occidental note as to how valuable this is and therefore don't sell your stock, remember that letter, it is an exhibit in the case, he was an outsider, they conceded. He was trying to get across and they wouldn't let him. That is all right. That is a corporate battle, and they sold out quickly to Tenneco in order to keep them out. That is all right. That is also a corporate matter. *Now he buys Kern stock and by their conduct over which he has no control because no matter how he voted, they carried it, and he didn't vote.* He becomes an owner of Tenneco shares, not Kern, and he never did bid for Tenneco shares. *This is compulsory, involuntary,* so 16–B (sic) doesn't apply because he is not making a short, quick sale because something has happened over which he has no control of, and I think everyone agrees, even in the Securities Exchange Commission, if that were the sole situation here, the receptacle law ought to apply in general, not for our case, that an involuntary transaction, that involuntary transactions should be deemed 16–B (sic) violations of any kind, reorganization. * * * "

" * * * At this point Tenneco or Kern or both, now that they are in league with each other, take what I clearly think is an immoral position that since you may be sued under 16–B (sic), and of course there will always be suits, there are always plaintiffs around like these able fellows who attack you, and even though we promised not to close until December, which is in evidence here, *December was the date, so we would not even have had a possibility of a suit* they now are in haste, they have an agreement among themselves 'Rush the date up,' You know, in order that 'We may have the litigation problem,' and for what purpose? So that the money which we made as a profit will go back to whom?"

(All emphasis in quotations added).

4. Section 25507 of the California Corporations Code, requiring the permit referred to, reads in pertinent part:

"If the commissioner finds that the proposed plan of business of the applicant and the proposed issuance of securities are fair, just, and equitable, that the applicant intends to transact its business fairly and honestly, and that the securities that it proposes to issue and the method to be used by it in issuing or disposing of them are not such as, in his opinion, will work a fraud upon the purchaser thereof, the commissioner shall issue to the applicant a permit authorizing it to issue and dispose of securities, as therein provided, in this State, in such amounts and for such considerations and upon such terms and conditions as the commissioner may provide in the permit. Otherwise, he shall deny the application and refuse the permit, and notify the applicant in writing of his decision."

only remaining obstacle, and Tenneco presented its application to the Commission for the issuance of the permit. The conference with the Commissioner on the application was set for August 7th.

Some of the Kern stockholders did not agree that Occidental's profit under the option agreement was exempt from the provisions of Sec. 16(b). A derivative action was filed against Occidental on July 25th in the United States District Court for the Southern District of New York seeking to recover under that statute for the benefit of Kern stockholders all the profit realized by Occidental under its option contract with Tenneco. Occidental did not want to lose the advantage it thought it would have if the transaction were closed more than six months after the date it had acquired the Kern stock. It appeared at the conference before the Commissioner on August 7th and asked that the granting of the permit for the issuance of the Tenneco convertible preference shares be delayed to give it an opportunity to work out its Sec. 16(b) problem. That began a round robin of multiple actions designed to delay the consummation of the plan. 600 California Corporation claims in this suit that Occidental inspired or instigated them at the expense of the overwhelming majority of the other stockholders.

While the conference with the Commissioner was still in progress, counsel for Tenneco and Kern there present were advised by long distance telephone that a State district court in Midland County, Texas, had granted a temporary restraining order enjoining any further steps toward closing. The suit was filed in Midland shortly before 5:00 P.M., Central Standard Time; but notice of it reached Kern officials in the middle of the afternoon, Pacific Standard Time. Upon receipt of the information, action on the application for permit was postponed.

The case filed in the District Court of Midland County, Texas was a derivative action styled Cause No. 23,128, CMC Corp., et al. v. Kern County Land Company et al. The plaintiffs were CMC Corp., George T. Conly and A. Wayne Peters, suing individually and for the benefit of all Kern stockholders as a class. The defendants were Kern County Land Company, Tenneco, Inc., KCL Corporation, Occidental Petroleum Corp., and certain named officers and directors of each of such defendant corporations. The petition charged that the officers and directors of Kern were proposing to sell and convey all of Kern's properties to Tenneco and KCL without legal authority "under the laws of the States of Texas, California or otherwise", for an inadequate price "which is unfair to plaintiffs and all other stockholders of Kern," without mature and proper consideration, and without having had a "fair or proper valuation of the property and assets of Kern." It further alleged that such conduct amounted to a breach of fiduciary duty on the part of the officers and directors of Kern to get the best price possible for the Kern properties. The petition does not mention the vote of the Kern shareholders approving the plan, even though they were the ones who actually authorized it. CMC Corp., et al., prayed for injunctive relief by way of an *ex parte* temporary restraining order, a temporary injunction and a permanent injunction, in that sequence, "restraining defendant corporations, in person or by or through their officers, directors, agents or representatives, from in any manner, directly or indirectly, selling, conveying, transferring or exchanging the business or assets, real or personal, of Kern County Land Company or stock of any other kind or nature or for any other consideration furnished by Tenneco or KCL Corporation."

The plaintiff here insists that Occidental was made a party defendant in the Midland County suit only for the purpose of window dressing so as to cover up the fact that it was the instigator of the action. It must be admitted that it is hard to see any basis for suing Occidental. It was not a party to the actual transfer and conveyance of Kern's assets to KCL, any more than any other

Kern shareholder acting in his individual capacity. There was no necessity for an injunction against Occidental, and none was actually sought. The only allegations in the petition relative to Occidental[5] were that it had in its possession some relevant information about the value of the Kern stock. It was sued only for the purpose of making demand on it to produce such information. Such imaginative pleading, if it ever becomes recognized as accepted practice, would replace the subpoena with the summons, and subject witnesses to unnecessary attorneys' fees and other expenses of litigation even in cases where they would be perfectly willing to produce information in their possession.

The *ex parte* temporary restraining order was granted as prayed for, and the hearing on the application for temporary injunction was set for August 17th. Instead of announcing ready when the hearing was called, the plaintiffs had a motion to delay, with a request for a continuation of the restraining order. The Court overruled the motion and proceeded to hear the evidence. The hearing lasted a full day. The only attorney who appeared for Occidental was the Midland house counsel for its subsidiary, Permian Corporation. He never uttered a word after announcing ready. On August 18th, the Court dissolved the temporary restraining order and denied the application for temporary injunction.

Conly and Peters were partners in a certified public accounting firm. CMC was owned by them, and served as their investment agency. Conly was the President of CMC. Its liabilities just about equalled its assets. Peters was the only named plaintiff in Cause No. 23,128 who was a registered owner of Kern stock on June 1st, the cutoff date for voting stock at the shareholders' meeting on July 17th. He had acquired his 200 shares just before the deadline, and by proxy voted it *in favor* of adopting the plan. CMC and Conly have never been registered owners of any Kern stock, even to the time of the hearing before this Court. Conly testified in the Midland cases that on May 17th he had a broker buy 200 shares for him and 1000 shares for CMC at around $85.00 per share. He said it was bought on margin, and that he had to pay at least 70% of the purchase price. He felt sure that neither he nor the corporation had the necessary cash; and, although he was testifying in August after having bought the stock in May, he could give no idea as to the source of the money used. The stock was bought in street name, and has never been transferred to Conly or CMC. Although Conly's broker forwarded to him all the literature regarding the plan sent out by Kern, including the notice of the special stockholders' meeting and the proxy statement, Conly was apathetic about giving the broker instructions and the stock was not voted at the meeting.[6]

Conly said that he became suspicious of the Kern reorganization plan when he read a magazine article in a July 22nd issue quoting an official of Tenneco as saying that Tenneco had made an excep-

5. All of the allegations in the petition, in Cause No. 23,128, relating to Occidental and all of the relief sought from it appear in paragraph 6 of the petition which reads:

"Occidental is the largest single stockholder of Kern and abstained from voting on the proposed plan to sell and convey the business and assets of Kern to Tenneco. Occidental if the owner of approximately 887,000 shares of stock of Kern. If the plan is approved and carried out, as it will be unless restrained and enjoined, Occidental will receive in exchange for its shares of Kern approximately 887,000 shares of the preference stock of Tenneco. Based upon the information contained in the proxy material, it appears that Occidental had and has information that the value of Kern stock is in excess of the value offered by Tenneco, and demand is hereby made that Occidental produce such information on the trial and each hearing of this cause."

6. Conly said his brokers forwarded the proxy notice of the July 17th meeting to him. He took no interest in the meeting or the plan.

tionally good buy. He claimed that he thereafter read other news items that gave him the same impression; but he never consulted with a lawyer about doing anything until August 7th. On that date, he discussed the matter with one of the partners in a large law firm in Midland. Conly and Peters had done the firm's accounting work, and it had handled their legal matters. The firm was also counsel for Occidental, so it had to disqualify in the matter on account of conflict of interest. Conly then advised with another Midland lawyer who also had a conflict. He thereupon called the lawyer in Lubbock who has since been active in behalf of all the plaintiffs in these multiple cases. Cause No. 23,128 was filed in Midland that day, but Conly met his Lubbock lawyer for the first time two days later. There is no explanation as to how this near miracle was accomplished in one day. It would ordinarily be considered a good job if a lawyer were consulted about a case of this kind early in the morning and got it filed in his home town the same day. Here, however, Conly spent the first part of the day going over the matter with two different law firms, before calling a lawyer in another town over a hundred miles away. He was able to give that lawyer a good enough account of this complicated transaction in a telephone conversation to enable him to prepare a petition that had to be sworn to and got to Midland in time to be filed that same day. Likewise, Conly did not explain why he got into such an eleventh hour rush to file the suit and to give notice of the temporary restraining order by long distance telephone, rather than in the conventional way. As far as the evidence shows, Occidental was the only Kern shareholder which appeared at the hearing before the California Commissioner of Corporations to oppose the issuance of the permit necessary to the consummation of the reorganization plan. It is difficult to understand Conly's actions on August 7th, unless he was in contact with representatives of Occidental. He had taken no active part in connection with the reorganization plan up to that time.

On August 16th, the day before the temporary injunction hearing in Midland, CMC Corp., Conly and Peters filed Civil Action No. 47,676 in the United States District Court for the Northern District of California, at San Francisco, seeking to recover for themselves and for the benefit of all other Kern stockholders $108,000,000.00 damages from Kern, Tenneco and KCL and from the directors of Kern individually. Occidental was not named as a party. The alleged basis of the claim was that the transfer of Kern's assets under the plan was for an inadequate consideration resulting in receipt by the stockholders of $25.00 per share less than the actual value of their stock. There was no mention of an injunction in the original complaint. The Lubbock attorney who appeared for these same plaintiff shareholders in Cause No. 23,128 in Midland, selected and engaged the local attorney in California to file that suit and has been working actively with him.

On August 17th, while the temporary injunction hearing in Cause No. 23,128 was in progress in Midland, Harjean Co., a Nebraska corporation, filed suit against Kern County Land Company in Civil Action No. 1272 L in the United States District Court for the District of Nebraska, at Lincoln. It was alleged that the proxy statement mailed with the notice of the Kern shareholders' meeting of July 17th violated Securities Exchange Regulation 14A by being false and misleading, and that, as a result thereof, the approval of the plan adopted at the shareholders' meeting with the aid of proxies obtained by such statement was void. The prayer was "that the defendant, its officers, directors, employees and agents, be enjoined perpetually from taking any further steps to consummate the reorganization planned between the defendant corporation and Tenneco, Inc., and KCL Corporation." Shortly after noon on August 22nd, Judge Van Pelt granted a temporary restraining order

enjoining Kern from taking any further steps to consummate the reorganization plan, and set the hearing on the application for temporary injunction for August 28th. The five day delay in getting the temporary restraining order was due to the fact that when the motion therefor was first presented to the Judge, the only verified instrument supporting it was the affidavit of Harjean's Lincoln, Nebraska lawyer as to what Conly's Lubbock lawyer had told him about the transaction. The complaint itself was not verified. The Judge would not grant the *ex parte* order under the circumstances.

When the situation was made known to the Conly group, Conly and his Lubbock lawyer flew from Midland to Nebraska in a chartered jet so the lawyer could make an affiadvit for use in getting the temporary restraining order. 600 California Corporation claims the charter fee for the jet was $1,400.00, but nobody seems to know who paid it. Conly claimed he had no idea who provided the jet, and said that he did not expect to pay for it. The best explanation he could offer was that he thought the Lubbock lawyer was paying for it himself. He did admit that a senior member of the Midland law firm which represented Occidental in that area talked to him in person at the Midland airport just before the takeoff. Volpe, the President and owner of Harjean Co., was evasive about his feelings in regard to that expense. He was not consulted about it in advance, and had not been billed for it. He had no expectation of paying it.

Conly and his Lubbock lawyer did meet in Lincoln on August 21st and conferred with Volpe and his Nebraska lawyer. The Lubbock lawyer made an affidavit to support the one already made by the Nebraska lawyer. The motion for temporary restraining order,[7] supported by the additional affidavit, was then presented to Judge Van Pelt again; and he thereupon granted the motion and set the application for temporary injunction for hearing in Lincoln as aforesaid. In his comments later, he said the *ex parte* order was entered "to quite an extent" on the basis of the second affidavit.

There is nothing in the record to indicate that it was made known to Judge Van Pelt, at the time he was considering the motion for temporary restraining order on August 22nd, that on the day before, Harjean had already procured a similar temporary restraining order in Cause No. 5961, Harjean Co. v. Kern County Land Company, et al., in the District Court of Knox County, Texas. While the grounds alleged there as a basis for injunction were different from those relied upon in the Nebraska case, each *ex parte* order enjoined the same acts: the closing of the reorganization plan. Harjean filed the suit in Knox County as a derivative action, for the benefit of itself and all other shareholders in Kern, against Kern, Tenneco, KLC, Occidental and certain named officers and directors of each of such corporations. The petition was signed and sworn to by the Lubbock lawyer who was representing the Conly group in Cause No. 23,128 in Midland County. The prayers in the petitions in the Knox and the Midland cases were the same, word for word. The grounds for injunction in such petitions were the same, too, even though the Knox County petition pleaded some detail to support its conclusory allegations. The allegations in each of the two cases relating to Occidental were also identical. The Court has been unable to see any justification for the filing of this suit in

---

7. Until that time, there had been no request for any kind of preliminary injunctive relief. The complaint was not verified. Its prayer, asking only for relief on final hearing, read:

"WHEREFORE, plaintiff demands judgment that the defendant, its officers, directors, employees and agents, be enjoined perpetually from taking any further steps to consummate the reorganization planned between the defendant corporation and Tenneco, Inc., and KCL Corporation, that plaintiff recover from the defendant the costs of this action, including a reasonable sum as attorneys fees."

Knox County, Texas, about a thousand miles away from Harjean's base in Omaha, Nebraska, when it could have been combined with an action Harjean already had pending in nearby Lincoln. Judge Van Pelt, in commenting on this matter after he had heard the evidence on Harjean's application for temporary injunction in the Nebraska case on August 28th, said that he had difficulty reconciling this procedure,[8] and that he could not approve "the filing of one suit here and then hiring another counsel and filing another suit down in Texas in another court based upon another facet of the same general transaction. * * *"

If, for some reason no impartial observer has yet been able to see, Harjean just had to file its second injunction suit in Texas, the logical thing to do would have been for it to join as a plaintiff in Cause No. 23,128, then still pending in Midland County. While the application for temporary injunction in that action had been heard and denied, the case was still pending for trial on its merits. That procedure would have been much more economical, especially since the same lawyer was representing the plaintiffs in both cases. The Court knows from matters of which it can take judicial knowledge that Midland, Texas would also have been far more convenient than Benjamin, the county seat of Knox County, if Harjean was disposed to ignore the advantage of its home district in Nebraska.

■ The Court has the authority and the duty to take judicial knowledge of census facts,[9] and of certain matters in the state where it sits, such as the prominent geographical features,[10] land-

---

8. The following is quoted from Judge Van Pelt's remarks:

"* * * Evidently there are several other actions pending and some that were threatened across the country. Of particular interest is the fact the plaintiff has in some court in Texas begun a suit to obtain an injunction there and did that after this suit was filed. I have a little difficulty in reconciling that procedure when in this court in a complaint the plaintiff can join any claims he has regardless of whether they are the outgrowth of the same transaction or not—although this would be a very definite case of the same transaction; so we don't have to worry about that issue; but any claims that the plaintiff has could have all been filed in this case."

These and all other remarks of Judge Van Pelt are taken from his findings and conclusions dictated to the court reporter at the close of the evidence on the hearing of the application for temporary injunction on August 28th. The following quotation from the supplemental formal findings and conclusions shows the evaluation the Judge intended his remarks at the conclusion of the trial should have:

"* * * The hearing continued until midnight. At that time the court announced its decision and dictated an opinion to the court reporter which the court intended as findings of fact and conclusions of law."

"* * * Because of the lateness of the hour and the concluding of a twelve-hour day in formal court sessions, the court recognizes that the announced conclusions and findings are not in the detail which may be desirable in this case, and hence, re-affirming its pronouncements on August 28, 1967 at the conclusion of the hearing, enters the following findings of fact and conclusions of law."

At the request of the defendant, the Court did later file formal findings of fact and conclusions of law supplementing those dictated at the conclusion of the hearing. Such formal findings and conclusions state at the outset that the Court is "re-affirming its pronouncements on August 28, 1967, at the conclusion of the hearing."

9. Granville-Smith v. Granville-Smith, 349 U.S. 1, 75 S.Ct. 553, 99 L.Ed. 773 (1954); Ervin v. State, 119 Tex.Cr.R. 204, 44 S.W.2d 380; Holcomb v. Spikes, Tex.Civ. App., 232 S.W. 891, 894, no writ history.

10. Barstow Town Co. v. Carr, Tex.Civ. App., 234 S.W. 555, no writ history; Southern Underwriters v. Boswell, Tex. Civ.App., 141 S.W.2d 442, affirmed 138 Tex. 255, 158 S.W.2d 280; Granville-Smith v. Granville-Smith, supra, footnote 9; Hoefs v. Short, 114 Tex. 501, 273 S. W. 785, 40 A.L.R. 833; Humphreys-Mexia Co. v. Arseneaux, 116 Tex. 603, 297 S.W. 225, 53 A.L.R. 1147.

marks,[11] public buildings,[12] existence of public means of transportation,[13] and distance and time of travel.[14] Knox County is about the last place a person with such knowledge would expect to see litigation over a corporate reorganization involving two giant corporations such as Kern and Tenneco. Knox County lies within that vast portion of West Texas which is included in the jurisdiction of the United States District Court for the Northern District of Texas. The county is rural in character, with some farm land, some very large ranches, and no industry of any consequence. A good part of it is true "Marlboro Country". The 1960 census gives the population of the county seat as 338, and of the whole county as 7857. In Granville-Smith v. Granville-Smith, cited in footnote 10, the Supreme Court of the United States took judicial notice of the fact that there were considerably greater tourist facilities on the Islands of St. Thomas and St. John than on St. Croix, in the Virgin Islands. If that same authority were exercised here, this Court would have to say that the tourist facilities of nearly any town in Texas are "considerably greater" than the one little motel and bus stop cafe at Benjamin. The Court should also take judicial notice of the jail, either as a public building or as a landmark, because it figures prominently in the picture on account of the motion now pending in the Knox County case to hold the attorneys and officers of Kern, et al. in contempt. If the Judge in Knox County should decide that those parties should be committed to custody until all action

towards consummating the plan taken since August 30th is rescinded, it would be difficult to find a jail that would inspire quicker action. It is risky to say that its conveniences are probably obsolete, because its age and general appearance suggest that there may not be any conveniences. Its only obvious asset appears to be the unobstructed view, except for the bars, from all of its windows. Benjamin's courthouse, post office, general store, filling station, motel and cafe offer no obstruction to the view of an inmate who wants to look out across the great expanse of sparsely settled, open country. The transportation facilities could hardly be worse than they are at Benjamin for people trying to reach it from a distance. It is located about half way between Fort Worth and Lubbock. The bus line is the only public transportation serving the entire county. The nearest airports with convenient transcontinental connections are at Lubbock, Fort Worth and Dallas, 150 to 200 miles away. The Conly group could not have selected for Harjean a more inconvenient place to try a case requiring participants to travel from San Francisco, or even from Omaha where the owner of Harjean lives.

The following allegations appeared on page one of the petition in the Knox County suit:

"NOW COMES Harjean Company,[15] a Nebraska Corporation, *doing business in Texas. * * * *"

"Plaintiff, Harjean Company, *is a Nebraska Corporation not licensed to do business in Texas*, but is now se-

11. Conyers v. State, 98 Fla. 417, 123 So. 817.

12. Brown v. Knox County, 187 Tenn. 8, 212 S.W.2d 673, 5 A.L.R.2d 1264; Morris v. Mutascio, 114 Cal.App.2d 275, 249 P.2d 852; Petillo v. State, 234 Ind. 385, 126 N.E.2d 895, cert. den. 350 U.S. 918, 76 S.Ct. 205, 100 L.Ed. 804; State v. Ballard, 209 Ark. 397, 190 S.W.2d 522.

13. Lancaster v. Mebane, Tex.Civ.App., 260 S.W. 256, writ ref.; King v. Chicago, R. I. & G. Ry. Co., Tex.Civ.App., 241 S.W.

180, no writ history; United States v. Chicago, B. & Q. R. Co., 8 Cir., 293 F. 185.

14. Boyd v. Genitempo, Tex.Civ.App., 260 S.W. 934, no writ history; Griffin v. Duty, Tex.Civ.App., 286 S.W.2d 229, no writ history; Loeb v. Turner, Tex.Civ. App., 257 S.W.2d 800; Ball Bros. Trucking Co. v. Sorenson, Tex.Civ.App., 191 S.W.2d 908, no writ history.

15. The corporate name is actually "Harjean Co."

curing such a permit to do business in Texas. * * *" (Emphasis added.) In spite of this affirmative showing on the face of the petition of Harjean's lack of authority to invoke the jurisdiction of a Texas court,[16] the *ex parte* temporary restraining order was issued as prayed for on August 21st, and the hearing on the application for temporary injunction was set for August 28th.

Harjean did not get its permit to do business in Texas until August 31st. The only business it ever had or contemplated in Texas was the lawsuit in Knox County. Volpe had never been in that county until after that case was filed. There is no evidence that any of the parties had any connection, residential or business, with any of the counties in the state judicial district embracing Knox County that would ordinarily be a factor in selecting a forum.

█ The circumstances connected with the filing of the Harjean cases in Lincoln, Nebraska and in Knox County, Texas settle any question about the fact that the Conly group has been determined to keep multiforum litigation going constantly over a widespread area for the purpose of delaying the consummation of the plan, if not to defeat it, knowing all the time that they had no chance of winning the litigation. The second Harjean case, and possibly the first one, was filed as a result of the urging of the Conly group, and there is little doubt that Harjean is just a front for the Conly group in the case in Knox County. That Judge Van Pelt had the same impression about the Knox County case is evidenced by the following quotation from his findings dictated into the record of the Nebraska case: " * * * And I am not

sure that I think the equities are helped at all for the plaintiff, going off to Texas and turning over to some lawyer to file some action about which he [Volpe] doesn't seem to know too much other than he didn't want it to be inconsistent with the action up here."

Harjean Co. is a small family owned corporation which was chartered in Nebraska in February, 1967. Its only stockholders are Harris Volpe and wife. He is an employee of the Internal Revenue Service, and makes his home in Omaha. Harjean is merely an agency for handling the investments of the Volpes. Its assets consist of 100 shares of Kern stock, 100 shares of Iowa Power & Light Co. stock, a one-fourth undivided interest in a 192 acre farm inherited by Mrs. Volpe, and $550.00 cash. It apparently does not operate as a business and has no office as such. Volpe, as President of Harjean, received all literature sent out by Kern to its shareholders about Occidental's moves and the plan for reorganization. He attended the meeting of the Kern shareholders on July 17th, asked for a detailed breakdown on the valuation of the corporate properties, questioned the values listed in the proxy statement, and made a speech opposing the adoption of the plan. The Conly group, none of which had opposed the plan, and one of which had voted in favor of it, were in dire need of a man like Volpe.

The contact between Volpe and the Conly group came about as a result of Volpe's reading of a news item in *The Wall Street Journal* about the filing of the injunction suit in Midland. Volpe called Conly by long distance on August 10th or 11th to find out what was going on. The Lubbock lawyer was in Conly's

16. Art. 8.18 of the Texas Business Corporation Act, Vernon's Ann.Tex.Civil Statutes, provides: "No foreign corporation which is transacting, or has transacted, business in this State without a certificate of authority shall be permitted to maintain any action, suit or proceeding in any court of this State (whether brought directly by the corporation or in the form of a derivative action by a shareholder) on any cause of action arising out of the transaction of business in this State, until such corporation shall have obtained a certificate of authority * * *."

Smith v. Jasper County Lumber Company, Tex.Com.App., 124 Tex. 156, 76 S.W.2d 505; Normandie Oil Corporation v. Oil Trading Co., Inc., 139 Tex. 402, 163 S.W.2d 179.

office at the time, and he participated in the telephone conversation. The lawyer called Volpe back the next day, and made an appointment to see him in Omaha on August 13th. Volpe says that while the Lubbock laywer was in Nebraska for the conference, he talked to Volpe's Lincoln lawyer "about my situation". The Lincoln lawyer was employed by Volpe the very next day to file the Nebraska case.

Conly telephoned Volpe on August 18th and told him that the Midland court had denied the application for temporary injunction. Conly talked to Volpe about having Harjean file another injunction suit, although the one in Lincoln was then pending. Volpe's answer was a definite "No", but he finally agreed to let Conly discuss the matter with the lawyer in Lincoln. Some member of the Conly group did talk to Volpe's lawyer in Lincoln; and after the results of that discussion were made known to Volpe, he agreed to let Conly's Lubbock lawyer file the suit for Harjean in Knox County, Texas.[17]

Kern, Tenneco and KCL learned for the first time on August 22nd that Harjean had two temporary restraining orders against them in separate courts. Those suits, coupled with the other delay actions, caused them to seek equitable relief to put an end to the merry-go-round of oppressive, vexatious litigation. On August 23rd they filed Cause No. 23,170 in the District Court of Midland County, Texas, against Harjean, CMC, Occidental, and Conly, Peters and Volpe, individually and as representatives of Kern stockholders as a class, and against the members of the Lubbock law firm which had been representing the Conly-Harjean group, seeking an injunction against the further prosecution or filing of suits to delay or defeat the closing of the plan. The Judge granted an *ex parte* temporary restraining order enjoining each of them from taking any further action in any pending suit for injunction to prevent the closing of the plan, including both Harjean cases, except to dismiss them, and from directly or indirectly in any manner attempting to interfere with the closing. The hearing on the application for temporary injunction was set for 9:00 A.M., Friday, August 25th. That hearing began as scheduled and continued through Friday and most of Saturday, when it was recessed until 9:00 A.M., Wednesday, August 30th, at the request of the defendants. The Court thereupon entered an order continuing in effect the temporary restraining order theretofore granted until August 30th, and from day to day thereafter until terminated by the Court. It was that recess which permitted Mr. Nizer to go to the Securities and Exchange Commission to attempt to get Occidental an exemption from Sec. 16(b). It also gave other counsel an opportunity to go to Lincoln for the August 28th hearing on Harjean's application for temporary injunction.

The hearing in the federal court in Lincoln was completed in a night session on Monday, August 28th. The temporary restraining order was dissolved and the application for temporary injunction was denied. As has been heretofore indicated, Judge Van Pelt dictated his findings and conclusions into the record at the close of the evidence. Among other things, he found and concluded:

1. The Kern board of directors was not guilty of any misconduct in connection with the reorganization plan. It

17. Volpe's testimony in this connection was: " * * * They didn't get the restraining order. And so at that time there was a discussion between Mr. Conly and me, as I was interested in maybe filing a suit. I didn't think—well, *I definitely said no.* That is a fact. Then I said, 'Call my attorney and speak to my attorney. My attorney from there on out will have to take it up with me.' And he called me back and that is when I hired him." (Emphasis added) This clearly refers to the Knox County case, because the conversation took place after the Nebraska suit had already been filed. Also, the lawyer he mentioned as being hired for the case was Conly's Lubbock lawyer who did thereafter file the suit in Knox County for Harjean.

gave sufficient study to the Tenneco proposal before recommending it to the shareholders.[18] They may have had to act in the time they did "for the protection of the stockholders against raiders.[19]"

2. The prospectus sent out by Kern to its stockholders was adequate and not fraudulent or misleading.[20]

3. The act of moving the closing date up to August 8th was not a fraud on the Kern stockholders.

*Note:* The point about the closing time appears to have been strongly emphasized at the hearing and in the second affidavit offered in support of the application for the temporary restraining order. The Judge said that order was entered largely upon that one ground.[21] It is difficult to see how moving up the closing time hurt any of the stockholders except Occidental.

4. When the equities of denying or granting a temporary injunction were considered, "it would seem the harm that would come to the defendant corporation and its stockholders by its entry is so much more than the benefit that could possibly ensue to the holder of 100 shares of stock to continue the restraining order under the circumstances you have here. The harm to the plaintiff is minor compared to the harm to the defendant." The Judge said that, in balancing the equities, he had also considered that the plaintiff had little likelihood of success in its litigation to defeat the plan, that the wrongful acts alleged in the petition, even if they happened, did not affect the result at the stockholders' meeting on July 17th, and that the shareholders had an adequate remedy at law by way of an action for damages.

The hearing in the Midland case was resumed Wednesday morning, August 30th, but it was not concluded that day. When Court convened on the following morning, one of Kern's Fort Worth lawyers made the following statement:

"If the Court please, I would like to make this announcement: A short time after the adjournment of the Court yesterday afternoon we were advised by Kern County Land Company, KCL Corporation, and Tenneco, Inc., that the long sought-for permit for the closing of the transaction between Kern County Land Company, KCL Corporation and Tenneco had been issued by the California Corporation Commission of California. We were

18. " * * * I am inclined to the opinion from the evidence before me here tonight that there was sufficient study of the proposal by the Kern County Board."

19. " * * * I am not determining the reason for the action of the Kern County Land Company, and yet I think the Board of Directors in the background and the Court must have in mind that the things they did might have been done for the protection of stockholders against raiders."

20. "I have read this prospectus. I recognize there are many things that could have been in it and aren't, yet all in all it is sufficient to tell Mr. Volpe or any other stockholder that Kern County Land Company had valuable assets, and have assets throughout the world of large oil reserves and gas reserves. The value of such property is always a matter of speculation; and the most even a geologist can say is that he can make an educated guess. It is largely a determination of what is under the ground, and at best is an educated guess.

"The prospectus I think does set forth a great deal about the land and properties, and it seems to me that it is enough that I should not hold that there was misrepresentation in the prospectus as far as the properties are concerned and as far as the values are concerned. All this adds up so far as I am concerned as of tonight, based upon the record before me, I would not be inclined to hold that this prospectus was fraudulent or that the statement contained such material misrepresentations that I should attempt overriding the action that was taken by some 68 percent of the stockholders of the company considering the fact that Occidental did not vote their stock."

21. " * * * The temporary order was entered upon one ground alone, or largely upon one ground, and that is the one relating to the so-called closing time of the transaction. * * * [W]hether or not there was an attempt * * * to have an earlier closing, and thus work a fraud upon the stockholders. * * * "

asked by Kern County Land Company, KCL Corporation and Tenneco, Inc. as to whether or not there was at that time any legal restraint which would prohibit the closing of this transaction. We replied that in our opinion there was no such restraint at that time. Within a short time thereafter we were advised by Kern County Land Company, KCL Corporation, and Tenneco, Inc. that the transaction had been completed and closed. It is our opinion that where the controversy as to the closing of this transaction is the subject matter of any litigation now pending, that such controversy is now moot, and therefore all plaintiffs move for a non-suit in this cause."

The non-suit was granted and the case was dismissed.

Occidental's role in the second case in Midland was directly opposite to the passive attitude it had taken in the previous one there when the Conly group was attempting to enjoin the consummation of the plan. In Cause No. 23,170, where an injunction against vexatious litigation would have facilitated the closing, it fought the plaintiffs with everything it had. Instead of the local house counsel for its subsidiary who had appeared for it in the first Midland case, it called in its "Sunday pitcher", a lawyer from New York who was famed for his experience in litigation involving corporate mergers and reorganizations. He took the lead in the fight against the injunction to prevent delay. He claimed that the lack of concert between Occidental and the other defendants was evidenced by what he called a hostile examination of Mr. Davis, Vice-President of Occidental, and by the fact that "these people are attacking us." By "these people" he meant Harjean; and the "attack" referred to was the suit in Knox County where the only relief asked from Occidental was that it be required to produce whatever information it had as to the value of the Kern stock. At one point in the case, it was argued, " * * * where is there the slightest equitable consideration here to warrant this extraordinary relief, and

what kind of relief, completely unauthorized relief, a relief stopping another plaintiff in a case that was started after this proceedings, as I understand it, the one in Knox County. * * * " That argument was made, not by counsel for the Conly-Harjean group, but by counsel for Occidental who had just shortly before claimed that his client was under attack in the Knox County case. Occidental's position in the last Midland case is further evidenced by the following remarks of its lawyer:

" * * * [A]nd even though we promised not to close until December, which is in evidence here, December was the date, so we would not even have had a possibility of a suit they are now in haste. * * * "

" * * * [B]ut I conclude with this, suppose even that this was our position, that we were saying 'For God's sake, let's delay this for six months.' What is wrong with that? No Court ought to raise its scepter to strike at us. * * * "

Kern, Tenneco and KCL closed the reorganization transaction, as among themselves, on August 30th, shortly after the permit was granted by the California Corporation Commissioner. All conveyances, transfers and other legal instruments necessary to the consummation of the transaction were duly executed and delivered in San Francisco that day. Kern changed its name to 600 California Corporation and dissolved. KCL changed its name to Kern County Land Company. The only thing remaining to be done was the distribution by 600 California Corporation of the Tenneco convertible preference shares to its shareholders in *pro rata* exchange for their Kern stock according to the provisions of the plan. Directions for sending the Kern stock to the Transfer Agent for the exchange, along with a notice of the closing, were mailed to the Kern shareholders on August 31st. By the middle of September, 1967, over 1,000,000 Kern shares had been received by the Transfer Agent, and over 160,000 had been physi-

cally transferred. Exchanges were being made as quickly as was mechanically possible.

The Conly-Harjean group lost no time in taking advantage of the termination of the temporary restraining order in the Midland case on the morning of August 31st. Later on that same day, an amended petition was filed in the case in the federal court at San Francisco, adding a prayer for injunction restraining the defendants from "selling, transferring or disposing of any of the assets pursuant to the Plan" to the one for $108,361,000 damages. Two days later, on Saturday, September 2nd, Harjean filed a pleading in the Knox County case asking the Court to hold in contempt and punish the defendants and those of their representatives who had been connected with the closing transaction on August 30th, until they rescinded the corporate combination. No stone was left unturned to keep the Knox County temporary restraining order from fading out as the other two had. This new pleading had added to it, as attorneys for the plaintiff, not just the leading lawyer and the usual local attorney, but two more attorneys practicing in that judicial district. That gave Harjean the able Lubbock lawyer it had had from the beginning of the case and one lawyer from each of the three counties in the 50th Judicial District of which Knox County was a part. On Tuesday, September 5th, an amended petition was filed praying for a mandatory injunction to require the corporation combination to be rescinded. The name of another lawyer from the 50th Judicial District was added to the amended petition, giving Harjean five sets of lawyers, with four of them as local counsel. It is difficult to conceive of this small family corporation owning only $10,000.00 worth of Kern stock going to the expense of having such a battery of lawyers. The defendants in the Knox County case filed a petition and bond for removal of the case to the federal court before any contempt hearing could be held. On October 13, 1967, Judge Hughes entered an order of remand.

The order in the Knox County case, dated August 28th, extending the temporary restraining order until 10:00 A.M., September 2nd, was not signed by the Judge. One of the five Harjean lawyers signed the Judge's name to the order out of his presence under authority given by the Judge over the telephone. The Judge has furnished a certificate setting out the facts as he knew them, and this Court accepts the matters stated therein as being true. The Judge saw and read the order on the morning of August 28th when it was presented by the attorney who later signed the Judge's name to it, but the Judge stated that he would not sign it until one attorney for each side had approved it. Later that day, Harjean's lawyer called the Judge at his home in Knox City about fourteen miles from the county seat, and told him that the local lawyer for the defendants in the district had approved the order after talking with associate counsel in Fort Worth. The Judge was informed that there had been no substantial changes in the order since he had seen it that morning; and he thereupon told counsel for Harjean to sign the order for him, and to file it and direct the district clerk to enter it in the minutes of the court. The affidavit of the attorney who approved the order along with Harjean's lawyer states that he represented only Kern, Tenneco and KCL; that he did not have authority to represent any of the thirteen other defendants; and that he did not intend to act for them in approving the order. The order was signed at a time when the temporary restraining order in Cause No. 23,170 in Midland was in full force and effect and while Harjean had no permit to do business in Texas.

The respective plaintiffs in Cause No. 23,128 in Midland County and Civil Action 1272 L in the federal court in Nebraska have taken non-suits in those cases. No action except the dismissal was taken in either one of them after the denials of the applications for temporary injunction.

There has never been any likelihood that the Conly-Harjean group would be

successful in their suits to enjoin the closing of the plan. Their actions in trying to maintain these multiple, repetitious cases in courts scattered over the country show they realized that. The balancing of equities would have required any judge hearing one of the injunction suits before August 30th to reach the same conclusion Judge Van Pelt did. The situation became impossible from the standpoint of these disgruntled stockholders following the issuance by the California Corporation Commission of the permit to Tenneco on August 30th. To accomplish a return to the *status quo* as it existed just prior to the issuance of the permit would require: (1) the recall of the permit, (2) the setting aside of the corporate dissolution of the original Kern County Land Company and the restoration of its status as a multimillion dollar going business concern, (3) the conveyance by KCL to Kern of all the assets received in the closing and the adjustments as between those companies growing out of KCL's assumption of Kern's liabilities, and (4) the recall of the Tenneco convertible preference shares issued to individual shareholders in exchange for their Kern stock regardless of who might now own those shares. The court in Knox County could not compel those things to be done even by granting Harjean's request that the accused corporate officers and attorneys be thrown in the pokey at Benjamin and required to stay there and gaze out upon a striped moon and listen to coyote music until they brought about the return to the *status quo*. The action in Knox County is futile because the closing of the reorganization plan is beyond recall.

Although the Court is of the opinion that the circumstances herein set out establish that there was some connection between Occidental and the dissatisfied stockholder plaintiffs in these delay actions, the decision reached is not dependent upon that finding. There is little doubt that somebody with a lot more at stake and a much stronger motive for delaying the closing than these named plaintiffs was furnishing an almost unlimited expense account to finance this weird a pattern of delaying actions. The timing, the co-ordination, the connection of the same lawyer with all the cases, and the ever present, mysterious source of money to foot the heavy expenses were not just happenstance. It appears, however, that the plaintiff here has proved more than was required of it in this respect, for it was not necessary to show that concerted action was involved. 28 Am.Jur., at p. 717, states the rule to be: " * * * The vexatious litigation may result from the prosecution of many suits by the same individual, or many suits by different individuals." The decision in this case would be the same if there were no concert of action among the disgruntled stockholders.

The conclusion is inescapable that this merry-go-round of repetitious litigation in different courts over the country is oppressive and vexatious. It is hard to realize that all this happened to Kern, et al. in a period of less than a month. The only logical conclusion from all the circumstances is that this type of harassing litigation will in reasonable probability continue in the absence of equitable intervention.

Since ancient times, a court of equity has had the inherent power to enjoin repeated, baseless and vexatious litigation. 28 Am.Jur. pp. 708, 715, 716, Secs. 200, 209, 210, Injunctions; University of Texas v. Morris, Tex.S.Ct. 344 S.W.2d 426 (1961); Renfroe v. Johnson, 142 Tex. 251, 177 S.W.2d 600; Clinton v. United States, 9 Cir., 297 F.2d 899 (1961), cert. den. 369 U.S. 856, 82 S.Ct. 944, 8 L.Ed.2d 14; Meredith v. John Deere Plow Co. of Moline, 8 Cir., 261 F.2d 121 (1958), cert. den. 359 U.S. 909, 79 S.Ct. 586, 3 L.Ed.2d 574; Rudnicki v. McCormack, D.C.R.I., 210 F.Supp. 905 (1962), app. dis., 372 U.S. 226, 83 S.Ct. 679, 9 L.Ed.2d 714. The quotations that follow are taken from those authorities:

Rudnicki v. McCormack, at p. 909:

" * * * Thus it has long been settled that a court of equity may enjoin the institution of repetitious and

baseless litigation. The ancient bill of peace had this as one of its purposes * * * "

University of Texas v. Morris, · 344 S.W.2d at p. 428:

"A district court having jurisdiction of the parties and the subject matter may enjoin a party from prosecuting a cause of action in another court when such relief is necessary to prevent a multiplicity of suits, avoid vexatious litigation, or prohibit the use of the judicial processes for purposes of harassment."

Meredith v. John Deere Plow Co. of Moline, 261 F.2d at p. 124:

" 'As to appellee's right to the injunction issued, the subjecting of another to repeated, baseless and vexatious suits at law on some particular subject matter is, without reference to other considerations, a sufficient ground for the issuance of an injunction against the perpetrator.' "

28 Am.Jur., at p. 717:

"The power of equity to enjoin such litigation exists independently of its power to prevent a multiplicity of suits. * * * "

A beneficial merger or combination of two large publicly held corporations could never be completed if it were not for this rule.

■ There is no merit in the defendants' claim that 28 U.S.C.A. § 2283 prohibits this Court from issuing an injunction in a case of this kind because a state court action is involved. American Optometric Asso. v. Ritholz, 7 Cir., 101 F.2d 883 (1939), cert. den. 307 U.S. 647, 57 S.Ct. 1047, 83 L.Ed. 1527; Jamerson v. Alliance Ins. Co., 7 Cir., 87 F.2d 253, cert. den. 300 U.S. 683, 57 S.Ct. 753, 81 L.Ed. 886. In the *American Optometric* case, the Court said at page 887 of 101 F.2d:

"We are of the opinion that the facts alleged in the bill of complaint in the instant case, which are established by the evidence, constitute grounds for the exercise of the equity power of in-

junction by the federal district court and that under the decisions of the Supreme Court of the United States the exercise of such power does not fall within the inhibitions of Section 265 of the Judicial Code." (In speaking of Sec. 265 of the Judicial Code, the Court was referring to a statute that is now 28 U.S.C.A. § 2283).

■ ■ Another reason why defendants' argument is unsound is that this is a diversity action and the substantive law of Texas applies. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If this case were in the state court, the Texas Supreme Court cases above cited would authorize the relief sought by plaintiffs. The fact that the case is filed in the federal court under the diversity statute does not deprive the plaintiff of any substantive rights it would have under the state law. A somewhat similar situation was presented in People of Sioux County, Neb. v. National Surety Co., 276 U.S. 238, 48 S.Ct. 239, 72 L.Ed. 547, 551, a diversity action in which the surety company was contending that a Nebraska statute providing for taxing of attorneys' fees as costs in certain suits on insurance policies could not be enforced in the federal court on account of a federal statute relating to court costs. In upholding the state conferred right, the Supreme Court said:

" * * * Disregarding mere matters of form, it is clear that it is the policy of the state to allow plaintiffs to recover an attorney's fee in certain cases, and it has made that policy effective by making the allowance of the fee mandatory on its courts in those cases. It would be at least anomalous if this policy could be thwarted and the right so plainly given destroyed by removal of the cause to the federal courts."

■ 600 California Corporation and its shareholders will suffer irreparable injury for which they will have no adequate remedy at law unless a temporary injunction is granted. There is no way

to recover the tremendous expenses of defending this type of multiforum litigation. The corporation and its stockholders are entitled to have the exchange of stock completed in accordance with the plan. Those owners who have sent in their Kern stock and have been prevented from receiving their Tenneco shares in exchange are hampered in the exercise of the attributes of ownership. They could have problems if they should want to sell their stock or borrow money on it. They ought not to be made to suffer from the effects of the type of delay actions here involved.

The minority stockholders are entitled to be protected in a corporation combination or merger. They have complete protection here in their action for damages against solvent defendants such as those named in the suits in the federal courts in New York and San Francisco.

Nothing in this opinion is intended as a reflection on any of the attorneys involved. This Court has the highest respect for their ability and integrity. The litigation in question could well seem justified to them even though it appears otherwise to the Court. They are viewing the matter subjectively while the Court is seeing it objectively. The feeling among the shareholders is deep and in many cases bitter. The stakes are high. The officers and directors of Kern think that they have made a good deal for the shareholders, but they are being accused of fraud and are being sued for $108,000,000.00. If the Sec. 16(b) suits against Occidental are successful, it stands to lose not only the $8,866,230.00 cash payment it got for giving Tenneco the option on its Kern shares, but also all the normal profit it may realize out of the exchange of stock under the plan. It feels that Tenneco is encouraging that litigation so that Tenneco, as the present owner of Kern, will get back its option payment and more. Kern, Tenneco and KCL are convinced that Occidental is fomenting the delay at the expense of all the others involved to get time to try to work out its Sec. 16(b) problems. In such circumstances, it is more than nat-

ural for some of the feeling of the litigants to rub off on the advocates, and zealous actions done in the aggressive representation of their clients do not appear the same to them as they do to a judge who has no personal feelings in the matter. There is nothing unethical in Occidental's trying to get extra time to work out its difficulties; but the Court has to consider the interests of all the shareholders. It is a common and recognized practice for attorneys in Texas to appear for a litigant in a trial when they are in fact representing a party who is not actually named in the case. That happens all the time in personal injury cases where the defendant has public liability insurance. While the Court sees nothing unethical in the conduct of the litigation in question, when viewed through the eyes of the attorneys for the complaining stockholders, an objective judgment of this oppressive litigation, with little or no actual probability of success, has convinced the Court that unwarranted and irreparable injury will result just as surely as if the attorneys saw the matter like the Court does.

The Court is of the opinion that a temporary injunction should issue substantially as prayed for to put a stop to the filing or prosecution of any actions seeking to delay or defeat the consummation of the reorganization plan. Such injunction will become effective upon the approval by the Court of an injunction bond in the sum of $250,000.00, executed and conditioned as required by law. The terms of the injunction will be set out specifically in the order filed in connection with this opinion. There is no injunction against the prosecution of Civil Action No. 47,676, styled CMC Corp., et al. v. Kern County Land Company, et al., in the United States District Court for the Northern District of California, San Francisco Division, except that the parties may not amend in that suit to seek an injunction to prevent the consummation of the plan. While the Court has had the present case under advisement, permission has been granted Harjean to dismiss its case in Nebraska so as to

combine the S.E.C. facet of this transaction with the above styled suit for damages in San Francisco already filed by the Conly group. That suit is filed where it ought to be, and any dissatisfied Kern shareholder can get adequate relief there by way of damages if his rights have been violated by the reorganization plan.

This opinion will serve as findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.