Ex parte Bob TAMMEN.

No. CA 1-77-0012.

United States District Court,
N. D. Texas,
Abilene Division.

May 2, 1977.

Bob Tammen pro se.

Kenneth J. Mighell, U. S. Atty., Dallas, Tex., for the Government.

## MEMORANDUM ON DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

BREWSTER, District Judge.

Bob Tammen filed this petition for writ of habeas corpus seeking release from custody under an order of this Court holding him in contempt.

On March 23, 1977, this Court, after an evidentiary hearing with Tammen present

and participating,[1] held Tammen in civil contempt for wilful refusal to obey an order of this Court, dated November 29, 1976, that he comply with an IRS summons which directed him to furnish his books and records and any information he might have about his financial dealings with Charles D. Colley of Colorado City, Texas. The order of March 23rd committed Tammen to custody for a period of three days and fined him $100.00. It further ordered that he should continue in custody and pay a fine of $100.00 per day after the expiration of the three day period until he purged himself of contempt, if he had not done so during the first three days of his confinement.

In February, 1976, and prior thereto, the IRS was investigating the income tax liability of Colley for the years 1973 and 1974. He had filed a "no-information" income tax return for the year 1974. He wrote merely "5th Amendment" in blanks where he thought tax information was called for. The investigation did not involve Tammen's tax liability, but the IRS called upon him for whatever information and records he might have relating to financial transactions between him and Colley. Upon his refusal to furnish such records and information, the IRS issued a summons for it. His consistent refusal thereafter to produce such records and information led to the contempt order mentioned above.

The petition for habeas corpus is based on Tammen's claim that he purged himself of contempt in a meeting with IRS Agents after the Court's order of March 23rd. He says that he could not furnish them his books and records because they had disappeared, and that he gave the Agents all the information he could recollect, scant as it might have been.

The government contends that the information Tammen gave has little value, and that he can produce his books and records and important information regarding payments to Colley, when he becomes convinced that he has to do it.

Transcripts of the several court hearings and conferences between Tammen and the IRS Agents are in evidence, and the statements of fact in this opinion are taken from them.

Tammen and Colley are long time friends, and their wives are reasonably close. Both families lived in Odessa, Texas, until Tammen moved to Colorado City, Texas,[2] in the early 1970's. Tammen was in the plumbing business and Colley was in the electrical business. In 1973, partly due to Tammen's urging, Colley moved his family to Colorado City and set up his electrical business in the same small building where Tammen had his plumbing headquarters. With apparently little competition they got most of the plumbing and electrical work in and around Colorado City. On some jobs, Tammen would contract for the entire construction of a new building, or would take on a repair job which involved much more than just plumbing. On those jobs, he would do the plumbing work and get others to do the rest of the work. He always farmed out the electrical work to Colley. Tammen and Colley were participants in a federal tax protest group which will be more fully described later on. Tammen admitted that in the course of their dealings in Colorado City, Colley said to him: "Bob, what I earn from you, I earn from the sweat of my brow, and if anybody wants to know anything of our dealings, don't turn it over unless they file suit against me. I'd rather you wouldn't." [3]

1. Tammen said that he was financially able to employ a lawyer, but did not want one. That was consistent with the teachings of the tax protestor group he belonged to. They do not have a lawyer unless and until they are committed to custody.

2. The Court takes judicial knowledge that the population of Odessa was about 78,000 and that of Colorado City was around 5,000, and that Colorado City is located about 100 miles

east of Odessa on Interstate Highway 10. *600 California Corp. v. Harjean*, D.C.Tex., 284 F.Supp. 843 (1968).

3. Quoted from page 6 of Government's Exhibit 5, the transcript of the March 25, 1977 meeting between Tammen, his wife and attorney on the one hand and IRS Special Agents Wentrcek and Stamps on the other.

Tammen periodically turned over to his accountant in Colorado City all his business papers, including his cancelled checks, and the accountant prepared and kept the books.

Colley apparently got wind in late 1975 that the IRS was investigating him. Tammen carried around an instrument dated November 24, 1975, signed by Colley and sworn to by him before a notary public, advising Tammen Plumbing and its bookkeeper or C.P.A. "not to reveal or supply any records, statements or information to any persons or agencies concerning any business transaction of Charles D. Colley or Colley Electric." The instrument contained a threat of legal action if the instructions therein were not obeyed.

When the IRS got out the summons directing Tammen to produce such records and information as he might have relating to financial transactions with Colley, he showed his accountant the instrument above described. The accountant's response was that he did not want to get involved in a transaction of that kind, and for Tammen to come by in a day or so, when the records would be boxed up for Tammen to take possession of them. Tammen complied and got his records about February 3, 1976, the date the summons directed him to meet with the IRS Agent. Mrs. Tammen testified on this hearing that there were three cardboard cartons (each 2' x 2' x 2' ) of the books and records. The three cartons were put in the uncovered bed of Tammen's pickup truck. Tammen and his wife claim the records disappeared. They have told several versions about the "disappearance". Each version conflicts sharply with each of the other ones.

The following is a chronology of the events involving the matter of Tammen's records and information relating to business dealings with or money paid to Colley in 1973 and 1974:

1. On January 23, 1976, the IRS issued a summons requiring Tammen to appear before IRS Agent Wilson on February 3, 1976 at the office of the Postmaster in Colorado City, then and there to give information and produce documents relating to wages or any other payments made to Colley in the years 1973 and 1974 by Tammen as his employer. The summons listed the following types of documents pertaining to Colley which Tammen was directed to bring to the conference: W-2 and W-4 reports; cancelled checks payable to, or on behalf of, Colley; payroll or other ledger records showing payments to Colley in 1973 and 1974; any and all contracts or subcontracts setting forth payments to or services rendered Tammen in 1973 and 1974; any personal files relating to Colley.

2. Tammen appeared on February 3, 1976 at the time and place designated in the summons. He presented to the IRS Agent a letter which he said challenged the summons in good faith upon constitutional grounds, and told the Agent that he was not going to comply with the summons. Tammen challenged the summons on the grounds that it was part of a criminal conspiracy of IRS Agents to perpetrate a fraud on his friend Colley; that Colley had threatened to sue him for damages if he complied with the summons; and that the volume of the records in question was such that it would "require considerable expense to me in searching the records and duplicating them." [4]

3. On August 9, 1976, the United States filed a proceeding in this Court asking that Tammen be required to comply with the summons. Tammen notified the Court that he was entering the hospital for surgery in the latter part of that month, and the undersigned was also facing surgery, so the show cause hearing was set for November 29, 1976, at Abilene.

4. During October, Tammen filed a motion to dismiss the government's petition on what he termed were constitutional grounds. The Court had some arraignments set for November 4, 1977, so the

---

4. Quotation is from Tammen's letter, dated February 2, 1976, to Special Agent Wilson, which was admitted in evidence as Government's Ex. 1.

motion was heard on that day.[5] Tammen appeared pro se and argued that the summons did not meet due process standards because, under the Constitution and statutes, the government had no right to proceed against a person, since it was not a natural person. The motion to dismiss was overruled. Tammen did a lot of talking, but he never hinted that he did not have the records and information requested. His position was that he did not have to produce them. He did such a good job of convincing the Court that he had the records that the Court told him at the conclusion of the proceeding that he ought to consult a lawyer to find out if he had done anything that was a violation of the tax laws; that if he had, he could claim his privilege under the Fifth Amendment; and that if he had not, he ought to proceed to comply with the summons. In that connection, the Court said to him: " . . . And about the worst thing you could do now would be to destroy some of your records. Then, you would be into it, sure enough. . . ."[6] He never claimed that he did not have the records and information.

5. Tammen also appeared pro se at the show cause hearing on November 29, 1976. The following is quoted from the proceedings on that two hour hearing:

"THE COURT: Are you willing to produce the records that relate to any relationship that you had with Mr. Colley during these years in question? If you are, we will wind this thing up pretty quickly here.

"MR. TAMMEN: If they will specifically give me dates, transactions, numbers, amounts; properly describe the documents.

"THE COURT: They don't have to do that. If they did, they never would get any information."

At the conclusion of the hearing, after ordering Tammen to comply with the summons, the Court told him that if his own tax situation was clean, the sensible thing for him to do was to say: "Here are my books, and you are welcome to look at them. And I haven't done anything wrong. Here they are." The reply was:

"MR. TAMMEN: Your honor, I am sorry, but I feel different. In other words, if Mr. Colley has violated the law, he should be the one they are after, not me."

There was never any claim by Tammen in this hearing on November 29, 1976 that he did not have his books and records. On the other hand, each one of his statements quoted above positively indicated that he did have them.

6. The order to comply with the summons provided that Tammen should meet with the IRS Agents for that purpose at the office of the Postmaster in Colorado City at 10:00 A.M. on January 19, 1977. He appeared then and there with his wrecking crew. The transcript of those proceedings (Government's Ex. 3) shows that he brought with him a woman who took over and tried to make a farce of the proceeding.[7] The excuse for her participation was that she expressed herself better than Tammen did. Both Tammen and the IRS wanted to record the proceedings on their respective tape recorders, which they set up on opposite sides of the room. Mrs. Duke put a small child near the microphone of the IRS recorder, and its crying drowned out much of the proceedings on that recorder. Mrs. Duke's constant jabbering took care of what was left. She challenged the Agent's authority and almost every question he asked. She tried to put the Agent on the defensive by constantly asking him questions about the nature of any oath of office taken by him and the propriety of his questions to Tammen. Tammen said that he had no checks, books or records involving

5. The transcript of that proceeding is in evidence as Government's Ex. 2.

6. This is also from Government's Ex. 2.

7. This woman was identified in later proceedings as Rita Duke who appeared for the taxpayers at any proceeding where she was permitted for the purpose of disrupting it to the point where the IRS could not accomplish anything.

Colley, but did not say what had happened to them. He did not produce the records or furnish the information requested.

7. The government then filed a petition to have Tammen cited for contempt for his wilful refusal to obey the Court's order of November 29, 1976 directing compliance with the summons. The hearing thereon was held on March 23, 1977. Again, Tammen appeared pro se. At the conclusion of the hearing the Court found that Tammen was in civil contempt, and ordered that he be committed and fined as has already been set out. In this hearing Tammen testified that he got his books and records from his accountant around the time he first met Special Agent Wilson on February 3, 1976 in regard to the IRS summons and put them in the back of his pickup truck. He did not know what became of them. The following is quoted from Tammen's testimony at the contempt hearing:

"I met with Mr. Bob Wilson, on the day of the summons, at the post office. I entered him, or gave him the letter containing what I recognized as a good faith challenge.

"THE COURT: Now, that letter was offered in evidence on the other hearing?

"MR. TAMMEN: It was offered into evidence Your Honor. At that time, my accountant was keeping my books. And he did not want to get messed up in it. And he asked me if I might come get my books. And I told him, yes, I would.

"He did not want to keep them anymore.

"THE COURT: Now, who was your accountant that called you?

"THE RESPONDENT: Joe Moring.

"THE COURT: All right.

"THE RESPONDENT: At Colorado City. At this time, Your Honor, he said that he would have them ready for me in two or three days. Just drop by around and pick them up.

"I picked them up, and put them into my pickup. Now, where they have gone to from there, Your Honor, I do not know."

8. As is the practice in most of these cases, Tammen employed a lawyer soon after he was committed to custody.[8] The lawyer arranged for a meeting between Tammen and the IRS Agents on March 25, 1977 for the purpose of giving Tammen a chance to try to purge himself of contempt. Present at the conference were Tammen, his wife, his attorney and Special Agents Wentreek and Stamps. Tammen identified bank microfilm copies of 8 cancelled 1974 checks on his account at the City National Bank, Colorado City, payable to Colley. The mere identification of the checks was worth little in the determination of Colley's taxable income, because most of them bore the notation that they were in payment of a certain invoice or invoices. Tammen said that he was paying Colley for labor and materials, and he had no idea of how much of the payments was for either. The cost of materials was deductible, and the payment for labor was income.[9] In addition, the IRS had no way of knowing that the few checks it had taken from the microfilm were all the payments Tammen made by check or cash to Colley. It got microfilm copies only of those checks which appeared

---

**8.** Several reasons have been advanced for this tactic. (1) The tax protestor is not subject to the restrictions under which a lawyer practices. He has no license to lose. He cannot be suspended or barred from practice in federal court. He can therefore get by with practices designed to obstruct the judicial process that a lawyer would not try. (2) In the jury trials for criminal offenses growing out of the obstructive practices, the taxpayer can get his position before the jury by leading questions and by unsworn statements without taking the witness stand. (3) He usually receives help a lawyer does not receive in the effort to see that his rights are protected, and the prosecution ordinarily proceeds very tenderly.

**9.** It was suggested by Tammen's counsel in this hearing that the IRS might have accomplished something civilly by setting up the total amount of the checks or income and putting the burden on Colley to show how much of it was not income. However, this investigation involved a possible criminal prosecution of Colley. In addition, the IRS was entitled to have the facts if they were available.

on Colley's deposit slips.[10] They did not go through the tedious job of looking at all the checks on microfilm over a period of several months or a year. At that meeting, Tammen said under oath that his books and records disappeared from the back of his pickup in March or April, 1976.[11]

9. The present habeas corpus hearing followed the conference of March 23, 1977. The petition was filed by the lawyer who represented Tammen at the March 25th conference with the IRS Special Agents; but Tammen changed lawyers before the hearing on the petition.[12] The Court denied the petition at the conclusion of the evidence.

Two more versions of the "disappearance" of the books and records were given in this proceeding. Attached to the petition was an affidavit of Frank M. Nicholson,[13] who said Tammen told him on August 26, 1976 (1) that he got his records from his accountant "sometime prior to the time the IRS wanted him to produce"; (2) that he placed them in a storeroom at his plumbing headquarters; (3) that he did not know what happened to them, but they disappeared from the storeroom; (4) that he surmised they were either thrown away by the man who cleaned the place periodically, or that some IRS Agents unlawfully entered his headquarters at night and stole them. This story was repeated to him by Tammen on August 28, 1976 and again on August 29, 1976.

Mrs. Tammen testified on the hearing that she was present when Tammen loaded the three cartons of his books and records in the bed of his pickup truck in the first part of August, 1976.[14] The pickup was never kept in a garage. When it was not being used, it was parked in the open in the driveway at their house or at the store. There was no cover of any kind over the bed or the cardboard cartons containing the records. The cartons were exposed to the weather at all times. Those cartons disappeared on August 29, 1977. She fixed the date by the fact that after closing hours on the night of August 28th some vandals fired a shotgun at the convenience store and filling station the Tammens were operating; and that when she discovered the damage the next morning, she went to the pickup to see if anything was missing, and found that the cartons containing the records were gone. They reported the vandalism to the authorities, but said nothing about the missing records.

Tammen never testified on this hearing.

The Court is of the opinion that Tammen's claim that his records have disappeared is a hoax, and that he is resisting compliance with the summons because he thinks he can get by with it as long as the government has no direct evidence to show he has possession of the records or access to them, and because he is an active participant in an organized movement to defy the IRS by obstructing its legal processes and those of the courts related thereto.

■ The government is not limited to direct evidence of possession in rebutting his claim about the records. It can prove

---

10. Copies of those deposit slips were examined at the bank.

11. The following statement of Tammen is quoted from page 3 of the transcript of the conference Tammen had with the IRS Agents on March 25, 1977 (Government's Ex. 5):

"  .   .   . [W]hen they disappeared was bound to have been in March or April of last year."

The Agent then asked the question: "March of April?" and Tammen answered: "It was some time then, because I know that's the last time I remember seeing them."

On that occasion he said they disappeared from the back of the pickup.

12. Each lawyer Tammen had was able and experienced, and they tried to persuade Tammen to purge himself of contempt by complying fully and in good faith with the summons. Tammen got rid of the second one after the habeas corpus hearing.

13. In addition to being attached to the petition, the affidavit is in evidence as Government's Ex. 14.

14. The government's motion to require compliance with the summons was filed in the first part of August, 1976. The order setting the date for the hearing on it was signed on August 9, 1976.

possession of, or access to, the records by evidence putting him in possession of them at or near the relevant times, and showing that his explanation of their disappearance is not credible. The principle involved is similar to the one that the offense of theft may be proved by evidence of possession by the defendant of recently stolen property, and of the unreasonableness or falsity of his explanation when he is called upon to explain his possession. *Melendia v. People of the Virgin Islands,* 3 Cir., 29 F.2d 741 (1928); *United States v. Fairchild,* 5 Cir., 505 F.2d 1378 (1975); *Callahan v. State,* Tex.Cr.App., 502 S.W.2d 3, 7 (1973). The last two cases hold that the prosecution is not limited to direct evidence in showing the unreasonableness or falsity of the explanation.

Tammen had no occasion to lie about what happened to his books and records, if their disappearance was not a hoax to avoid producing them.

The unreasonableness or falsity of Tammen's claim that his books and records disappeared under circumstances unknown to him is established by his own conflicting stories, his conduct in the courtroom, and the account given by his wife which rebutted all of Tammen's stories. There is no dispute about the fact that Tammen came into exclusive possession of his books and records at about the time of the issuance of the summons in January, 1976. By way of summary, the following accounts were given of the disappearance of the books and records:

1. They disappeared from the back of his pickup in March or April, 1976, shortly after he came into possession of them.

2. He took them to the warehouse portion of his shop, and they disappeared from there. He presumed the cleaning man threw them away by mistake, or that the IRS made a burglarious entry of the shop at night and stole them.

3. He took them from his shop and put them in the open bed of his pickup in the early part of August, 1976, and they were stolen shortly thereafter.

4. His wife said she knew of his putting the cartons containing the books and records in the back of the pickup in early August, 1976, but that they disappeared on the night of August 29, 1976. She fixes the date by the time vandals fired a shotgun into their convenience store.

In addition to the flat contradictions, Tammen's claim is further discredited by the following:

1. In the hearing in this Court on November 4 and 29, 1976, he made no claim that he did not have the records. He merely took the position that he did not have to produce them. That position was so strong that, near the conclusion of the November 4th hearing, the Court admonished him not to let anything happen to the books and records. During the November 29th hearing, in response to a question as to whether he was willing to produce the records, Tammen replied that he would if the IRS would give him the specific dates, transactions, numbers, amounts, and otherwise properly describe the records.

2. Tammen never reported any theft of the records to the authorities.

3. The stories about the disappearance are so unreasonable that they are not worthy of belief. Why would Tammen keep the cardboard cartons containing the books and records in the open bed of his pickup, exposed to the weather, for weeks? Contrary to intimations on some occasions during these proceedings, he had a pretty good accumulation of records. It took three 2' x 2' x 2' cartons to hold them. The notations on the microfilm copies of the few checks on his account which were available for the trial showed that he had invoices of his business transactions. One fact mentioned by Mrs. Tammen on this hearing is significant. She said one of the cartons had a check from Tammen to Colley attached to the outside of it. The only logical deduction is that it was there so a person helping in the disappearance hoax would be sure to get the right carton.

It is reasonable to believe that the books are not destroyed. There is something

about human nature that makes most men prefer to hide, rather than destroy, records. They feel that possession of them for reference purposes, when they are concealed from unfriendly persons, gives them an advantage.[15] Tammen knows he may lose his fight against federal taxation, and that he will need his books and records to establish his legitimate deductions. He is no different from most beligerent taxpayers whose records mysteriously appear, when they find out that the IRS does not have to go for a hoax that they are lost.

Mrs. Tammen testified on this hearing that her husband had got himself into this trouble by listening to bad advice. She said that bad advice came from a tax protestors group, one of which was the United Tax Action Patriots, commonly called "UTAP" by them. Evidence, oral and documentary, in regard to that organization was admitted for whatever it might be worth on the determination of the nature and extent of Tammen's motivation in defying the IRS. It is reasonable to believe that a person instilled with doctrines hostile to the IRS and taught how to defy them, would resist the lawful procedures of the IRS much stronger and much longer than the average person. That would be especially true with the person who feels that he has the active support of a large group of people in his organization.

Mrs. Tammen testified that she and her husband attended a few meetings of the Posse Comitatus[16] before they joined UTAP. She said that they had gone to many meetings of UTAP, and that it was Tammen's following the practices taught by them which resulted in his being held in contempt of court.

■ The evidence shows that the organized tax protestor group is growing rapidly.[17] It has spread eastward from the West Coast and is adding substantially and wrongfully to the workload of the federal courts.[18] The goal of UTAP is to do away with federal income taxation by making the burden so heavy on the IRS and the federal courts that the government will have to yield. It is their philosophy that the Sixteenth Amendment was improperly passed and therefore invalid, and that anyone attempting to enforce the income tax laws is violating the rights of the taxpayers and should be treated as a criminal.

The organization meets on a regular basis for the purpose of teaching its members the various and sundry methods of obstructing the IRS. Many of their speakers travel about the country to appear on the programs at these meetings. The members are told at these meetings that they should file protest type tax returns, commonly known as "porth" returns, containing only the name and address of the taxpayer; and that they should object to the completion of the form on various and sundry constitutional grounds. They are also instructed to file W-4 statements claiming as many as 99 exemptions to avoid the withholding of any tax from their salaries. Since such returns will obviously result in the matter being referred to the Audit Division of the Inter-

---

**15.** The tapes in the Watergate case are a good example.

**16.** The Posse Comitatus is a militant organization which advocates violence under some circumstances. Since Tammen quit it, the testimony regarding its teachings and activities will not be discussed.

**17.** The right of persons to protest any phase of federal taxation and the methods used to enforce it, as well as their right to assemble peaceably with others to make their protest more effective, is guaranteed under the First Amendment to the Constitution of the United States. Those rights are not questioned here. Tammen's problem comes from his attempt to obstruct the lawful processes of the IRS and of the federal courts.

**18.** During the past two months, almost a month of federal judicial time in the Fort Worth and Abilene Divisions of the Northern District of Texas has been consumed with cases growing out of this movement. During that period, there have been 14 criminal cases in the Fort Worth Division alone growing out of conduct taught tax protestors by these organizations. Most of the cases involve employees of large industries who turned in W-4 forms claiming 99 exemptions, so there would be no money withheld from their salaries for income tax purposes.

nal Revenue Service, they are further instructed that upon being requested to appear for an audit they should resist, if possible; and that if forced to appear, they should make every effort to disrupt such proceedings to the point of making a farce of them. They are told that in all cases they should avoid giving any correct or meaningful answers to questions propounded to them. If their actions ultimately result in court proceedings, they are to take whatever action is necessary to delay, obstruct and disrupt all such proceedings. Their philosophy involves the subversion, not only of the Internal Revenue Service, but also of the federal judicial system by tying up its courts in fruitless proceedings involving tax protestors.

The participants in the movement are urged to form a "church" consisting only of the husband and wife and their children, and to assign all their property and income to the "church" so as to claim it is exempt from taxation. For all other purposes they handle the property and the income for their own use, as if the "church" did not exist.[19]

The members of these organizations are taught that the dollar is not constitutional for the reason that the Gold Standard Act made paper money illegal and only gold is legal tender in the United States. They are also taught that they cannot be forced to produce documents or testimony against their will, and that such documents and testimony cannot be used in either civil or criminal proceedings. They should, therefore, in all cases refuse to testify or produce documents when requested, either formally or informally, by representatives of the IRS. They are further told that IRS summonses are not legal unless they are signed by a judge after a court hearing. They are therefore advised to disregard administrative summonses issued by the IRS.

For the most part, the speakers and instructors at all of these various meetings are persons who have been previously con-

victed of various violations of the tax laws of the United States.

The *Tax Strike News* is a widely distributed newspaper printed in California and mailed to all parts of the country giving all kinds of information concerning methods for obstructing the lawful procedures of the IRS and the federal courts.

Tammen appears to think that he satisfied the demand in the summons for his records when he admitted that the microfilm copies of a half dozen or so of his checks to Colley[20] were actually given to Colley, and claimed that the rest of his records had disappeared, and the demand for information regarding his financial transactions with Colley, by saying that he did not remember. The IRS was entitled to determine how many of the cancelled checks, invoices, bills and book entries in the three large cartons related to transactions involving Colley.

The Court finds and concludes that Tammen has not purged himself of contempt, and will enter an order denying the petition for writ of habeas corpus.

The request for entry of an order that would have the effect of releasing Tammen temporarily is also denied. If he were turned out now, the whole purpose of committing him to custody would be defeated.

This Memorandum will serve as the Court's findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.

---

**19.** Tammen took this kind of action on December 30, 1976.

**20.** One of the few checks the IRS had been able to find was for $2,000.00.